Argued and submitted August 28, vacated and remanded in part; otherwise affirmed October 11, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## ROGER LYNN BEASON, JR.,
*Appellant.*

(970634550; CA A101648)

12 P3d 560

Daniel M. Carroll, Deputy Public Defender, argued the cause for appellant. With him on the briefs was David E. Groom, State Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Judge, and Warren, Senior Judge.

BREWER, J.

## BREWER, J.

Defendant appeals from his separate convictions for intentional murder and murder by abuse arising from the death of a single victim. ORS 163.115.[1] We address defendant's contentions that the trial court erred by (1) denying his motion for judgment of acquittal for murder by abuse; (2) denying his motion for judgment of acquittal for intentional murder; (3) declining to merge the charges into a single conviction; and (4) imposing partially consecutive sentences on the convictions. Defendant's remaining assignment of error does not require discussion. We review for errors of law. ORS 138.220. We conclude that the court properly denied both motions for judgment of acquittal but that the separate charges must be merged into a single judgment of conviction. We thus vacate and remand the convictions for entry of one conviction of murder and resentencing.

Because defendant was convicted by a jury, we state the facts and all reasonable inferences that properly may be drawn from them in the light most favorable to the state. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Paramedics responding to a 9-1-1 call at defendant's residence found an unconscious infant who was not breathing. All efforts to resuscitate the victim were unsuccessful. In the course of examination, the paramedics discovered that the

---

[1] ORS 163.115 provides, in part:

"(1) Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"(a) When it is committed intentionally * * *;

"(b) When it is committed by a person * * * who commits or attempts to commit any of the following [felonies] * * *;

"* * * * *

"(c) By abuse when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age * * * and:

"(A) The person has previously engaged in a pattern or practice of assault or torture of the victim * * *[.]

"* * * * *

"(6) As used in this section:

"* * * * *

"(c) 'Pattern or practice' means one or more previous episodes."

victim's skull was severely fractured. The victim was transported to the hospital, where he was pronounced dead. The next day, the medical examiner, Dr. Gunson, performed an autopsy. Gunson determined that the skull fracture discovered by the paramedics likely caused immediate death. However, Gunson also documented 18 separate injuries to the victim's head and additional injuries to the face, lips, and jaw. Injuries were found on all planes of the victim's head—front, back, left, right, and top. In addition, the underside of his scalp showed bruising and bleeding around the brain. An examination of the brain revealed a neurological injury that occurred at least 12 hours before death. Gunson also observed scarring in neurons of the brain. Both of the victim's eyes showed signs of retinal hemorrhaging, and one retina was detached. His neck was bruised and scraped, and his tongue showed evidence of having been bitten. Six fractured ribs were partially healed. The victim's spine was fractured, which, according to Gunson, caused immediate paralysis. The examination showed no damage to internal organs except for a small bowel contusion.

Gunson concluded that the victim died as a result of Battered Child Syndrome, with massive terminal head injuries. She testified that the injuries resulted from at least three separate incidents of abuse, judging by the healing progress of each injury. The terminal skull fracture and fractured spine were fresh, indicating that they occurred just before death. Contusions under the scalp were three to five days old, and partial healing dated the broken ribs at two to six weeks old. According to Gunson, the fractured ribs would have made breathing painful for the victim and probably made him "fussy."

Defendant, who lived with the victim's mother, Rene Courtenay, soon became a focal subject of the ensuing homicide investigation. Police officers interviewed defendant several times, both before and after he was arrested. Defendant gave several versions of the events leading to the victim's death, eventually settling on the following account: On the day of the death, defendant stayed home from work because he was sick. He decided to take a shower and took the victim with him from the downstairs living room. Defendant said

that taking showers often seemed to calm the victim. Defendant claimed that he slipped as he stepped out of the shower while holding the victim. As a result, defendant fell to the floor with his full weight crushing the victim against the bathtub. Defendant took the victim into a bedroom and said he could feel the victim reaching out to hold his finger on the way into the bedroom. Defendant placed the victim on his stomach, and defendant said the victim raised his bottom into the air, as he normally did before sleeping. Defendant napped next to the victim for a while, and Courtenay joined them for a few minutes. Defendant and Courtenay eventually decided to go downstairs and watch television, leaving the victim alone. After watching television for a while, defendant went back upstairs and checked on the victim. He saw that the victim was not breathing and shouted for Courtenay to call 9-1-1.

The police also asked defendant about his knowledge concerning the victim's prior injuries. Defendant admitted that the victim had been with him when some of those injuries occurred. He said that he had tripped with the victim and fallen down the stairs two months earlier and that the victim's head struck the wall during the fall. A second time, three weeks before the victim's death, defendant had taken the victim to the basement because he was crying. Courtenay later woke defendant in the basement to ask about a "mushy spot" on the victim's head, but defendant said he did not know the cause.

At trial, Dr. Erwin, who examined the victim in the emergency room, testified that defendant's account of the bathtub incident failed to explain the victim's fresh injuries. First, she reasoned, if defendant had fallen on the victim, the spinal fracture would have been surrounded by bruising and attended by extensive damage to internal organs. In addition, the spinal fracture would have paralyzed the victim immediately, making it impossible for him to raise his bottom in the air, as defendant claimed. Next, had the victim's spine broken on the edge of the tub, as defendant contended, his skull fracture would have been lineal, rather than the shattering fracture that Erwin found. Having sustained both skull and spinal fractures, the victim would have been able neither to raise his bottom nor grasp defendant's finger, as defendant claimed. A fall immediately before death could not

have caused the older injuries, which were partially healed. Instead, Gunson testified that the autopsy findings were "classic" examples of Shaken Impact Syndrome.

> "In that syndrome[,] there is violent shaking of the child with an impact usually against a broad-based object such as a floor, a wall, or bed or couch. In this case, because of the severity of the fractures, it is more likely that the impact was against some hard object than against some soft object.
>
> "When we combine that with the fracture of the back[,] which is occurring in about the midback area, we can see a scenario where the child is grasped around the lower part of the body or the legs, perhaps shaken violently and impacted against a hard object. That is the only way I can conceive of having the fresh injuries that we see in the head * * * and the fracture of the back with that violent arching that had to occur."

Courtenay also testified about injuries the victim sustained while in defendant's care. Two months before the victim's death, defendant told her that he had fallen down the stairs while carrying the victim, resulting in a large bump on the victim's head and a lip injury. Courtenay also described the occasion, three weeks before the victim's death, when she awakened defendant in the basement to ask about similar injuries. She testified that defendant became angry, punched a door, and told her that the victim might have hurt his head on a toy. Defendant discouraged Courtenay from taking the victim to the doctor. He told her that she could be tested for drugs and might lose custody of her children. On a third occasion, within a week of the death, defendant returned from the store with the victim, whose lip was bleeding. Again, defendant told Courtenay that he had slipped and fallen while carrying the victim. Courtenay took the victim from defendant, who became angry that Courtenay was more concerned about the victim than about defendant.

Courtenay also read to the jury a note written by defendant in which defendant discussed each of her five children.

> "Your children, number one. This is one that has to be broke down. Jacob, all-around good kid, spoiled and pampered by grandma too fucking much and needs his ass blistered when he goes off, just to show him that he's nothing but a kid. Pete, the all-around not so good kid unless he thinks

there's something in it for himself or getting someone else in trouble. Needs ass whipping in his life to show him he's not so good. Andrew, great kid, my second. Needs a little guiding hand to stop any bad habits that might arise, not to mention change-your-life whipping. Christian, good kid potential but not until he gets more attention and loving than he does, a lot more. Being the second to last is hard and just for moral'—I'm not sure what this word is—attention and because he needs a good old ass whipping.

"[The victim], well, he needs what all of them do, love, lots of attention and mama to stop overbabying him, not to mention break from sucking eggs, swats, legs, hands, not hit but swatted. The crying, put him in his own room, closet drawer or whatever and let him rip until he can't rip anymore. You rest in quietness, attention, and me, me, me, so please don't be mad at me for what I feel."

Gloria Kennedy, Courtenay's mother, testified about defendant's conduct toward the victim. Kennedy was living with Courtenay and her children when defendant moved in with them three months before the victim's death. Kennedy testified that before defendant moved in, she never saw any injuries to the victim. After defendant moved in, she "noticed some bruises[,] and mainly I noticed that [the victim] was just fussy a lot and just wasn't like he had been before." Kennedy testified that she heard the victim screaming on one occasion when he and defendant were alone in a bedroom while Courtenay went to the grocery store. Kennedy became so concerned that she went in and took the victim from defendant.

At the close of the state's case, defendant moved for judgments of acquittal on both counts. Defendant asserted that the evidence was insufficient to establish either that he intended to kill the victim or that he had engaged in a pattern of abusing him. The trial court denied the motion, and the jury found defendant guilty on both counts. The trial court sentenced defendant to life imprisonment with a mandatory minimum of 25 years on each count. The trial court imposed 15 years of the sentence on the murder by abuse count to run concurrently with the intentional murder sentence and imposed the remainder of the sentences consecutively.

On appeal, defendant first argues that the evidence was insufficient to show that he had "previously engaged in a pattern or practice of assault or torture of the victim," as required by ORS 163.115(1)(c)(A). Defendant concedes that the evidence established that the victim had been injured previously, but contends that the state's evidence was insufficient to establish that *defendant* caused the prior injuries. Defendant points out that the state presented no direct evidence that defendant had previously abused the victim. Instead, the state relied exclusively on circumstantial evidence to establish the "pattern of abuse" element of the offense of murder by abuse.

■    Defendant appears to suggest that, because the circumstances surrounding the victim's prior injuries do not *compel* the inference that he caused them, the evidence was insufficient to create a triable issue of fact. Defendant relies on *State v. Rainey*, 298 Or 459, 466, 693 P2d 635 (1985), in which the Supreme Court held:

> "When, on a motion for judgment of acquittal, an inferred fact is used to establish an element of the offense * * *, the jury may be left free to infer that fact only when two requirements are satisfied: (1) sufficient evidence has been offered of the existence of the fact(s) giving rise to the inference to allow a rational factfinder to find the underlying fact(s) beyond a reasonable doubt; and (2) a rational factfinder could find that the inferred fact follows more likely than not from the fact(s) giving rise to the inference. *When, however, the inferred fact is the sole basis for finding the existence of an element of the crime, a third restraint comes into play.* In order to meet the requirement of proof of each element of the crime beyond a reasonable doubt, *the jury must be convinced that the inferred fact follows beyond a reasonable doubt from the underlying fact(s).*" (Emphasis added.)

Defendant misapprehends the significance of the third requirement described in *Rainey* for the use of inferences. It is entirely logical to say—as the court did there—that when an inferred fact is the only evidence relating to an element of the charged offense, the jury must be convinced beyond a reasonable doubt that the inferred fact follows from

underlying circumstantial evidence in order to find the defendant guilty. That unremarkable proposition must be correct if the state is to be held to proving each element of the offense beyond a reasonable doubt. However, what the jury must be *convinced* of is a different matter than what evidence is *sufficient* to establish guilt in the face of a motion for judgment of acquittal.

The proper rule becomes clear by considering *Rainey* in light of *State v. Cervantes*. In *Cervantes*, the state neglected to submit direct evidence of venue. The court observed initially that venue was an element that the state must prove beyond a reasonable doubt. *Id*. 319 Or at 123. The evidence showed that the crime in question was committed in a motel and was investigated by Coos Bay police officers. In addition, there was evidence that a victim's assistance program worker, who was employed by Coos County, met with the victim. However, there was no direct evidence that the motel was in the city of Coos Bay or that the city was in Coos County. The court held that the jury could infer from the fact that the victim's assistance worker met with the victim and that the Coos Bay police investigated the crime that the crime had occurred in Coos County. *Id*. at 126.

In *Cervantes*, the *only* evidence of venue—a material element of the charged offense—was circumstantial. Thus, if defendant's view of *Rainey* were correct, the court could not have concluded that the evidence was sufficient to establish venue; the inferred fact (that the crime occurred in Coos County) did not inevitably "follow beyond a reasonable doubt from the underlying fact(s)." 298 Or at 466. That the crime occurred in Coos County was merely one of several possible inferences that could be drawn from the evidence. However, the court did not even refer to *Rainey* but, instead, applied the familiar sufficiency of the evidence test:

> "In determining whether there is sufficient evidence to support a conviction in a criminal case, we must determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). That standard of review applies to the material allegation of venue. In

making that determination, this court resolves any conflicts in the evidence in favor of the state and gives the state the benefit of *all reasonable inferences* that properly may be drawn. *State v. Krummacher*, 269 Or 125, 137-38, 523 P2d 1009 (1974). Our decision is not whether we believe that defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a jury to have so found. [*King*, 307 Or at 339].

"There was no direct evidence in this case that the crime occurred in Coos County. Venue need not be proved by direct evidence, however. Rather, venue may be established by circumstantial evidence. *State v. Miranda*, 309 Or 121, 130, 786 P2d 155, *cert den* 498 US 879 (1990).

"Viewing the evidence in a light most favorable to the state and giving the state the benefit of *all reasonable inferences* that properly may be drawn, we conclude that there was sufficient evidence for the jury to find that the crime occurred in the City of Coos Bay. There was testimony that the crime was investigated by the Coos Bay police and that they made the arrest at the Pacific Empire Motel. There was also testimony that when the police returned to the motel after transporting defendant from there to jail, they 'came back to Coos Bay.' From that testimony, we believe that a rational jury reasonably could infer beyond a reasonable doubt that the crime occurred in the City of Coos Bay. We must determine, therefore, if there is sufficient evidence in the record from which the jury reasonably could infer that the City of Coos Bay is located in Coos County. We conclude that there is." *Cervantes*, 319 Or at 125-26 (emphasis added).

Thus, as *Cervantes* makes clear, defendant's apparent understanding of *Rainey* is incorrect. *Rainey* does not state a general rule that any inference that can be drawn from circumstantial evidence *must* "follow beyond a reasonable doubt" from that evidence if the inference provides the only basis for proof of an element of the charge.[2] Instead, it

---

[2] Although we have not always been explicit on this point, our prior decisions that have relied on *Rainey* are not to the contrary. *See, e.g., State v. Smelcer*, 148 Or App 225, 939 P2d 154 (1997) (citing *Rainey*, court concluded that evidence that defendant was intoxicated provided no basis for jury's inference that defendant was under the influence of alcohol); *State v. Lopez-Medina*, 143 Or App 195, 923 P2d 1240 (1996) (where no direct evidence existed connecting defendant to drug operation, court concluded, based on *Rainey*, that the underlying facts connecting defendant to people and residences involved did not support an inference beyond a

holds that the jury *must be convinced* that such a relationship exists in order to find the defendant guilty. Ultimately, the court in *Rainey* applied the same standard used in *Cervantes*, namely, whether "a rational juror *could* draw the proffered inference in reaching its decision * * *." 298 Or at 466 (emphasis added).

■ In any event, the problem at issue in *Rainey* is distinguishable from the circumstances here. The court there acknowledged that it was addressing a "narrow area of the law"—the transformation "from *prima facie evidence* to *presumption* to *inference* when these evidentiary devices are applied to the accused in a criminal case." *Id.* at 462 (emphasis in original). In *Rainey*, the trial court instructed the jury: "Proof of unlawful delivery of a controlled substance is *prima facie* evidence of knowledge of its character." *Id.* ORS 167.238(1) creates this statutory presumption. The court recognized, however, that there are constitutional problems with the use of presumptions if they alter the burdens of proof in a criminal case. *Id.* at 464. "The evidentiary device [of statutory presumptions] is not permitted to relieve the state of the burden of proving all elements of the crime." *Id.* at 465 (citation omitted). The court went on to state that "[w]e shall now turn to the issue of the quantum of proof required to use *these evidentiary devices*." *Id.* (emphasis added). There ensued a description of the reasonable doubt standard, followed by the statement that "it is clear that significant constraints emerge when the prosecution seeks to rely on what has been labeled a statutory presumption against a criminal defendant." *Id.* The court then identified those "significant constraints." First, "the trial court may not direct the jury to find a fact that is an element of the crime, even in the absence of rebutting evidence." *Id.* Then the court described the second and third "significant constraints" on the use of statutory presumptions in the passage relied on by defendant. *Id.* at 466. Viewed in context, it is clear that the rule stated relates to situations in which the state is seeking to use a statutory

reasonable doubt that defendant was connected to the drug operation); *State v. O'Hara*, 136 Or App 15, 900 P2d 536, *rev den* 332 Or 362 (1995) (citing *Rainey* and concluding that the jury could draw reasonable inference from the facts that defendant had been lying in wait, then tried to disable and trap victim in bathroom stall, that he had taken a substantial step toward rape).

presumption against a criminal defendant. Where—as in this case and in *Cervantes*—the state does not rely on a so-called statutory presumption, the jury may draw *all* reasonable inferences from circumstantial evidence to find that an element of a crime has been proved.

■    Viewed through the proper lens, it is readily apparent that there was sufficient evidence from which the jury could reasonably infer beyond a reasonable doubt that defendant caused several pre-terminal injuries to the victim in more than one episode and that, in doing so, he acted knowingly, intentionally, or recklessly. Defendant admitted being alone with the victim when the victim sustained the injuries that caused his death. Defendant also admitted being alone with the victim twice when other injuries first appeared. The victim's grandmother testified that the victim's injuries began to appear only when defendant entered his life, three months before his death. She also testified that on one occasion she had taken the victim from defendant in response to the victim's unusual screams. In addition, defendant's note expressed a willingness to physically punish the victim and his siblings. The investigating police officer testified that defendant changed his account and omitted critical facts in relating his role in the fatality, thus undermining defendant's credibility in his denial of a culpable role in the victim's older injuries. Moreover, the jury could have found that defendant's reactions and explanations when confronted by Courtenay about the prior injuries that the victim suffered while in his care were highly suspicious. The foregoing evidence was sufficient to permit a rational juror to infer beyond a reasonable doubt that defendant intentionally, knowingly, or recklessly engaged in a pattern or practice of assault or torture of the victim before the episode that resulted in his death. ORS 163.115(1)(c); ORS 163.115(6). The trial judge did not err in denying defendant's motion for judgment of acquittal on the charge of murder by abuse.

■    Defendant contends in his second assignment of error that the evidence was not sufficient for a rational juror to find that he *intentionally* caused the death of the victim, as required by ORS 163.115(1)(a). Again, defendant is mistaken. Generally, proof of a defendant's mental state must rest on inferences drawn from evidence concerning the

"action element" of the offense. *State v. Mitchell*, 48 Or App 485, 488, 617 P2d 298 (1980). For a charge of murder, the action element is "caus[ing] the death of another human being." ORS 163.005. The state may also establish intent by proving motive. *State v. Lehmann*, 6 Or App 600, 602, 488 P2d 1383 (1971). In this case, defendant's note and other behavior demonstrated frustration with the victim's chronic crying and jealousy at the amount of time Courtenay spent with the victim. Courtenay testified, for example, that defendant was angry when she was more concerned about injuries to the victim than she was about defendant. A rational jury could have found that defendant intentionally killed the victim out of frustration, anger, or jealousy.

■     In addition, evidence of a defendant's prior mistreatment of a victim may tend to negate the likelihood of accident. *State v. Mills*, 39 Or App 85, 88, 591 P2d 396 (1979). Here, Courtenay testified that the victim suffered head and facial injuries while alone with defendant on separate occasions before his death. Courtenay's mother testified that on one occasion she had taken the victim from defendant because the victim was screaming, as if hurt. Finally, Gunson testified that the victim was killed by being shaken violently and hitting a hard object, and defendant admitted being alone with the victim at the time of his death. Taken together, the evidence was sufficient for a rational juror to find that defendant intentionally killed the victim. The trial judge did not err in denying defendant's motion for acquittal on the charge of intentional murder.

■     Defendant contends in his third assignment of error that the trial court erred in declining to merge his convictions for intentional murder and murder by abuse. In imposing separate convictions, the court relied on *former* ORS 161.062(1),[3] which provides that "[w]hen the same conduct or criminal episode violates two or more statutory provisions

---

[3] After this case was tried, the legislature repealed ORS 161.062. Or Laws 1999, ch 136, § 1. The first sentence of *former* ORS 161.062(1), which is at issue in this case, appears in identical form in ORS 161.067. Both statutes began as identically worded proposals and both became law in 1985, one in amended legislative version, *former* ORS 161.062(1), and one in an unamended initiative version, ORS 161.067. Throughout this opinion, we refer to *former* ORS 161.062(1).

and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations." In *State v. Crotsley*, 308 Or 272, 779 P2d 600 (1989), the Supreme Court interpreted *former* ORS 161.062(1) as permitting separate convictions for charges arising from a single, uninterrupted course of criminal conduct only when the following questions were answered in the affirmative:

> "(1) Did defendant engage in acts that are 'the same conduct or criminal episode,' (2) did defendant's acts violate two or more 'statutory provisions,' and (3) does each statutory 'provision' require 'proof of an element that the others do not.' " *Id.* at 278.

Defendant focuses solely on the second requirement; he argues that ORS 163.115 (1)(a), (b), and (c) describe *alternative theories* of murder rather than *independent crimes* of intentional murder, felony murder, and murder by abuse. If defendant is correct, his convictions must be merged. *See State v. Barrett*, 331 Or 27, 10 P3d 901 (2000) (holding that aggravating factors are part of a single statutory provision under aggravated murder statute, ORS 163.095). The state, on the other hand, relies on *State v. Hessel*, 117 Or App 113, 844 P2d 209 (1992), *rev den* 318 Or 26 (1993), in which we affirmed five separate convictions for intentional murder of a single victim, and *State v. Burnell*, 129 Or App 105, 109-10, 877 P2d 1228 (1994), in which we affirmed two separate felony murder convictions arising from the death of a single victim.

■ ■ The Supreme Court's recent decision in *Barrett* informs our inquiry. In *Barrett*, the defendant was charged with and convicted of three counts of aggravated murder, based on three different aggravating circumstances involving the intentional killing of a single victim. As defendant does here, the defendant argued that his convictions must merge under *former* ORS 161.062(1). In construing that statute, the court emphasized the importance of the requirement that a defendant's acts violate "two or more statutory provisions" in order to avoid their merger on conviction. In doing so, the court cast doubt on our decision in *Burnell*. It said:

"In relying on its earlier decision in *Burnell*, the Court of Appeals in this case appears to have held that the fact that each count of aggravated murder requires proof of an element that the others do not *itself* establishes the existence of two or more statutory violations. The use of the conjunctive in *former* ORS 161.062(1), however, indicates that two separate inquiries are required: First, a defendant must violate two or more statutory provisions; only then does the court consider whether each statutory provision requires proof of an element that the others do not." *Id.* at 32 (emphasis in original).

The court cautioned that two statutes each may require proof of an element that the other does not and yet still be part of a single statutory provision for merger purposes. The court reviewed its prior decisions and analyzed the problem at hand as follows:

"Although this court stated in [*State v.*] *Kizer*[, 308 Or 238, 779 P2d 604 (1989),] that the phrase 'statutory provision' is not defined to mean either a section, subsection, or paragraph, we think that the use of a single section nonetheless is some indication that the legislature intended to define a single crime. The wording of the first sentence of ORS 163.095 supports that interpretation. It defines aggravated murder as murder 'committed under, or accompanied by, *any*' of various aggravating circumstances. * * * 'Any' means one or more. * * * Thus, the first sentence of ORS 163.095 suggests that any or all the enumerated circumstances simply serve to prove the single essential element of 'aggravation.'

"In addition, the context of ORS 163.095 includes the statutes setting out the penalties for murder and aggravated murder. For a so-called 'simple murder,' that is, a murder unaccompanied by any aggravating circumstance, the statutory penalty is a life sentence with a mandatory minimum period of confinement of 25 years. ORS 163.115(5)(a) and (b). If the murder is 'aggravated,' the penalties are enhanced: the defendant faces death, life imprisonment without the possibility of release or parole, or life imprisonment with a mandatory minimum sentence of 30 years. ORS 163.105(1)(a) and (c). That context suggests a single legislative intent to punish more severely certain murders that the legislature deems to be particularly heinous.

"* * * The wording of the statute that we just have reviewed shows that the harm that the legislature intended to address by ORS 163.095 was the intentional, aggravated killing of another human being. The aggravating factors constitute no more than different theories under which murder becomes subject to the enhanced penalties for aggravated murder. That defendant's conduct in intentionally murdering the victim in this case was 'aggravated' by 'any,' *i.e.*, one or more, act surrounding that conduct does not convert that conduct into more than one separately punishable offense." *Id.* at 35-36 (emphasis in original; footnote omitted).

As was the case in *Barrett*, the problem we face is one of statutory construction. The question is whether defendant's acts in committing intentional murder and murder by abuse violated two or more statutory provisions within the meaning of *former* ORS 161.062(1). That question in turn, requires us to construe ORS 163.115, the single statutory section that encompasses both of the types of murder of which defendant was found guilty. We follow the methodology set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). We look first to the text and context of the statute, and if legislative intent remains unclear, we look to legislative history. *Id.*

We begin with the text of the statute. The preface to ORS 163.115(1) provides that "[e]xcept as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder[.]" The remainder of subsection (1) enumerates and describes the elements of three types of murder: intentional murder, subsection (1)(a); felony murder, subsection (1)(b); and murder by abuse, subsection (1)(c). The sub-subsections are connected by the disjunctive "or." That structure could be construed as creating either a single crime with alternative theories of proof or, alternatively, three separate crimes constituting murder. *See State v. King*, 316 Or 437, 852 P2d 190 (1993) (DUII statute, ORS 813.010, is formatted in the disjunctive, permitting interpretation that enumerated variants either constitute separate crimes or are alternate theories of proving a single crime). On the other hand, the preface to subsection (1) refers to acts that "constitute[ ] murder," suggesting that only a single offense is contemplated, and

that each of the ensuing sub-subsections merely describe different ways of committing that offense.

The context of ORS 163.115(1) includes other subsections of the statute and related statutes. ORS 163.115(3) creates an affirmative defense "to a charge of violating subsection (1)(b)," felony murder, if a defendant satisfies five requirements demonstrating that the defendant had no knowledge of and played no role in a death occurring in the course of the commission of a felony. That defense is inapplicable to a charge of intentional murder or murder by abuse. Likewise, ORS 163.115(4) provides an affirmative defense "to a charge of violating subsection (1)(c)(B)," murder by abuse arising from neglect or maltreatment. That defense does not apply to intentional murder or felony murder. Furthermore, ORS 163.135 provides that extreme emotional distress is an affirmative defense to intentional murder under ORS 163.115(1)(a), but not to felony murder under (1)(b). Thus, ORS 163.115(3) and (4), and ORS 163.135 create defenses that are unique to specific types of murder, suggesting that the legislature may have contemplated that each of those variants would constitute separate crimes.

However, as in *Barrett*, it is significant that each of the offenses is included in the same statutory section. That factor suggests that only a single crime was intended. Other contextual clues indicate the same legislative intent. ORS 163.095(2)(d) defines aggravated murder to include circumstances in which "[n]otwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b)." In other words, an intentional murder committed during the course of a qualifying felony constitutes a single offense of aggravated murder, rather than two separate crimes of intentional murder and felony murder. In addition, murder is treated as a single offense for purposes of sentencing statutes and administrative rules, suggesting, as in *Barrett*, "a single legislative purpose to punish" offenders convicted of any of its variants. 331 Or at 36. *See* ORS 163.115(5)(a)-(b) (minimum sentence for murder conviction "under this section" is 25 years' imprisonment); OAR 213-005-0004 (post-prison supervision for murder is, unless otherwise directed, the remainder of the offender's life).

When all is said and done concerning the text and context of ORS 163.115(1), it seems likely that the legislature intended for all of the variants of murder to constitute a single punishable offense. However, enough doubt remains to justify an examination of legislative history in order to confirm our tentative conclusion. *See King*, 316 Or at 444 (court examined legislative history of DUII statute in order to confirm legislative intent on merger issue, because some ambiguity remained after consideration of statutory text and context).[4]

The legislature added subsection (1)(c) to ORS 163.115 in 1989 as HB 2033. The bill was sent to conference committee in the waning days of the legislative session to work out conflicts between House and Senate versions. In the course of a conference committee discussion on the eve of the bill's passage, Representative Peter Courtney compared the murder by abuse subsection to the felony murder subsection:

> "[The felony murder statute] says, in effect, if you are going to choose to commit a certain kind of felony, and in the course of that felony, somebody gets wiped out, we're not even gonna mess with intent. We don't mess with intent in terms of the murder factor. You're gonna be indicted for murder. *And we chose that when * * * you mess with a child, [and] it dies, we're not going to get into intent. You've got serious troubles on your hands in terms of our murder one.* And it's a policy decision. * * * That is exactly why we chose to do it this way." (Emphasis added.)

That comment suggests that legislators viewed proof of a pattern of child abuse under subsection (1)(c) as a *substitute* for proof of intent under ORS 163.115(1)(a). In another exchange, Representative Tom Mason and Senator Joyce Cohen reiterated the assumption in discussing the burden of proving a pattern of abuse under subsection (1)(c):

MASON: "[G]oing back beyond the incident is much harder. It's one thing to prove that * * * A shot B. Fingerprints on the gun; bullets in body; blood spatters on the wall in a certain pattern to show that A was standing in front of B. That's a typical murder prosecution. But if I have to find

---

[1] *King* predated *PGE* by several months but applied a similar methodology.

> proof * * * that sometime prior to that, that A shot B, or that A had a pattern of shooting at B, that makes my proof as a prosecutor extremely hard [in the murder by abuse context]."

COHEN: "But [in] some of them, you're going to have intent, and you'll go straight murder, in the traditional way."

The foregoing discussion strongly suggests that the legislature envisioned murder by abuse as an alternative theory for the crime of murder, one that would be especially useful where intentional homicide could not be proven. Accordingly, we conclude from our examination of statutory text, context, and history, that ORS 163.115(1)(a) and (c) are part of a single "statutory provision" within the meaning of *former* ORS 161.062(1). Therefore, the trial court erred by declining to merge defendant's convictions for murder and murder by abuse into a single conviction.

In defendant's fourth assignment of error, he argues that the trial court erred by imposing consecutive sentences for his two convictions. Because the convictions must be merged, defendant's objection to the consecutive sentence is moot.

■ Finally, there remains for consideration the proper disposition of this case on remand. As noted, in *Barrett*, the trial court entered separate convictions on three counts of aggravated murder. Although the Supreme Court held that the convictions must be merged, it concluded that the defendant's record nonetheless should reflect the full extent of his criminal conduct:

> "If the trial court were to enter a conviction on only one count, and dismiss the other two, it always would be possible that an appeal would result in a reversal, for insufficient evidence, of the count that was selected to serve as the basis for conviction. With the other two counts dismissed, defendant would be able to argue that he was entitled to a judgment of acquittal on the charge of aggravated murder. Such an outcome would be inappropriate, if there was evidence to sustain defendant's guilt under either of the other two counts, but there is no obvious mechanism for 'reviving' counts that have been dismissed.

"[W]e do not believe that the trial judge was required to hazard a legitimate conviction in that way. We think the appropriate procedure would have been to enter one judgment of conviction reflecting the defendant's guilt on the charge of aggravated murder, which judgment separately would enumerate each of the existing aggravating factors." *Id.* at 36-37.

This case presents a similar problem. Defendant was convicted on two theories of murder: intentional murder and murder by abuse. Were the judgment to rest on either count alone, that conviction might have been reversed on appeal, and the second count would have been extinguished without the possibility of revival. Such a result would be inappropriate for the reasons explained in *Barrett*. Therefore, we remand the case to the trial court with instructions to enter one judgment of conviction for murder, which judgment should enumerate both theories of conviction. Because that disposition requires that defendant be resentenced, we remand the case to the trial court for that purpose as well.

Convictions vacated and remanded for entry of one conviction of murder and resentencing; otherwise affirmed.