Argued and submitted May 26, judgment of conviction for aggravated murder on count one reversed; judgment of conviction for aggravated murder on count two affirmed; remanded for entry of corrected judgment; otherwise affirmed July 21, petition for review denied November 23, 2004 (337 Or 616)

STATE OF OREGON,
*Respondent,*

*v.*

ANTHONY SCOTT GARNER,
*Appellant.*

981296, 981307; A116412 (Control), A116413
(Cases Consolidated)

94 P3d 163

Eric M. Cumfer, Senior Deputy Public Defender, argued the cause for appellant. On the brief were Peter A. Ozanne, Executive Director of Office of Public Defense Services, and Ingrid A. MacFarlane, Senior Deputy Public Defender.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

■ Defendant appeals his conviction of two counts of aggravated murder. ORS 163.095(1)(e), (2)(e). Defendant asserts that the trial court erred in denying his motion for judgment of acquittal that challenged the sufficiency of the evidence with respect to both aggravating factors.[1] We review the court's ruling for errors of law, viewing the evidence in the light most favorable to the state to determine whether any rational trier of fact could have found the aggravating factors proved beyond a reasonable doubt. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). We affirm defendant's conviction for aggravated murder but reverse the judgment and remand to the trial court for entry of a judgment convicting defendant of only one count of aggravated murder.

In the summer of 1998, defendant lived on a boat owned by Warren Atha, whom defendant referred to as his "godfather." The boat was moored at a Warrenton marina. That summer, defendant befriended the victim, Dana Bailey, who moved in with defendant on Atha's boat. Bailey and defendant had a sexual relationship and used drugs together. Defendant's codefendant, Les Simpkins, was defendant's friend and drug supplier.

Defendant had a significant criminal past. He had served multiple prison terms, including sentences for a robbery conviction and related parole revocation, and convictions for criminally negligent homicide and attempting to elude. All told, defendant had served approximately 10 years in prison for those offenses. Defendant was afraid of police officers and was terrified of the prospect of returning to prison. On one occasion, defendant knocked Atha unconscious in a fight, and he threatened to kill Atha's girlfriend if she reported the incident to the police. On another occasion, during an argument between defendant and Atha's girlfriend, Atha called the police. Defendant grabbed Atha by the chest, held him above the floor, and said that he could not believe that Atha had reported him to the police.

---

[1] We affirm on defendant's third assignment of error without discussion.

Christopher Johns also was an associate of defendant. In 1998, Johns stole some property from his parents and sold it for drugs. Johns later tried to recover his parents' property. To facilitate that effort, Johns identified for the police the people who bought the property. As a result, the word in the local drug community was that Johns was a "snitch." Johns's reputation as a snitch made it difficult for him to buy drugs. Defendant himself accused Johns of being a snitch until he saw Johns use drugs. Defendant sold drugs to Johns and used drugs with him on the boat during the summer of 1998. On many occasions, however, defendant told Johns that, if he were a police informant, defendant would kill him. Defendant also asked Johns if Johns thought that Bailey was a "little snitch."

Johns met Bailey for the first time when he went to the boat with defendant. According to Johns, Bailey was very quiet and did not look "well." Johns stated that Bailey had small visible bruises and always "looked scared." Johns testified that defendant was argumentative with Bailey and that he would get angry with her and explode. Sometimes defendant would shove Bailey with his elbow. Defendant's volatile behavior frightened Johns.

James Caldwell lived with Bailey between 1996 and 1998. He saw Bailey a few times after she moved in with defendant. On the night of August 7, 1998, Caldwell saw defendant and Simpkins at the home of John and Cathy Blair. On that occasion, Simpkins told Caldwell that Bailey had to leave the boat because she was a police informer. Defendant was not present when Simpkins made that statement. However, during the same visit, defendant told Caldwell that Bailey was "driving him crazy."

Betty Songer knew Bailey and defendant. On the afternoon of August 8, Songer took defendant to a store to purchase liquor. Defendant told Songer that he thought that Bailey had stolen money from him, but he could not find it among her possessions. Defendant told Songer that he and Simpkins were going to "party." A few days later, after the murder, defendant called Songer collect from jail. Songer told defendant that he had "messed up." Defendant replied that "the only way I messed up is I didn't get rid of the body."

On August 8, Cindy McEwen was working as a bartender at a Warrenton bar. Simpkins came into the bar and told McEwen that he had witnessed a murder. Simpkins told McEwen that defendant had committed the murder. Simpkins stated that defendant had used Simpkins's knife to commit the murder. When Simpkins went to the bathroom, McEwen called her boss and asked her to call the police.

While Simpkins was in the bathroom at the bar, he spoke to a patron, Lincoln Jackson. Simpkins told Jackson that "[t]his girl just tried to off herself with my knife." Simpkins then removed a bloody knife from a sheath on his hip and rinsed it in the sink. Jackson also saw blood smeared on Simpkins's pants.

Police officers later came to the bar. Simpkins told the officers that he had witnessed a murder, that defendant had committed the murder, and that the victim's body was on the boat. The officers went to the marina but did not immediately accost defendant. An officer eventually saw defendant standing naked on the boat, carrying a small bundle. The officers tried to talk to defendant who, at one point, said that he had "tried to help her." Defendant ultimately threatened to blow up the boat unless he could talk to Atha. Soon thereafter, the officers heard a series of explosions, and the boat caught fire. Defendant jumped off the boat, and the officers pulled him from the water. Defendant had a lighter in his hand. The officers found Bailey's body on the boat, and they arrested defendant.

The forensic evidence showed that Bailey's body was charred after her death. Bailey was face-down when the fire started. Her death was caused by one or both of two stab wounds, one to her chest and the other to her head. The chest wound penetrated the lower lobe of Bailey's left lung. That wound was inflicted while Bailey was alive. According to the pathologist who performed the autopsy on Bailey's body, such a wound would cause the victim to gasp for breath as a result of air leakage from the lungs into the chest cavity. The stab wound to Bailey's head penetrated the skull into the temporal lobe of her brain. According to the pathologist, that wound, too, was inflicted while Bailey was alive, and it would

not have been instantly fatal. Bailey suffered a third, less serious, stab wound to the back of her neck. That wound did not penetrate her skull or injure her spinal cord. According to the pathologist, each of the wounds would have been very painful, and Bailey could have lived for up to an hour after they were inflicted.

After defendant's arrest, Atha had several telephone conversations with defendant at the jail. Atha was curious about Bailey's death, and he frequently shared with defendant the various rumors that he had heard. Defendant usually refused to discuss the matter with Atha. However, on one occasion, Atha stated that he had heard that defendant and Bailey had had an altercation over the purchase of drugs. According to the rumor, Bailey had asked defendant to "front"[2] her some drugs until she could get her next paycheck. Bailey purportedly had threatened to "turn in" Simpkins, defendant's supplier, if defendant refused to front the drugs. At first, defendant was reluctant to respond to Atha's account of the rumor, but he eventually replied, "[W]ell, something like that[.]" Then defendant said, "[P]ersonally, I can't talk about it."

Defendant was charged with two counts of aggravated murder. In count one, the state charged that defendant and Simpkins intentionally caused Bailey's death by "stabbing and slashing her, as a result of intentional maiming[.]" Count two alleged that defendant and Simpkins intentionally caused Bailey's death "in an effort to conceal the commission and identity of a perpetrator of the crimes of possession and delivery of controlled substances." A jury found defendant guilty of both counts. The trial court entered a judgment convicting defendant of both counts, but the judgment provided that, "[f]or purposes of sentencing, Count 2 merges with Count 1." Defendant appeals from that judgment.

■ In his first assignment of error, defendant asserts that the trial court erred in denying his motion for judgment of acquittal on count two because of "insufficient proof of the

---

[2] The evidence showed that "fronting" drugs means to deliver them in advance of payment.

aggravating factor." In count two, the state sought to prove that defendant murdered Bailey to conceal his or Simpkins' drug possession or delivery.[3] According to defendant, the evidence would permit a reasonable factfinder to determine that "defendant was responsible for Bailey's murder, either as a principal or as an aider and abettor. It could not determine a reason for the murder beyond a reasonable doubt, however." Defendant contends that the circumstantial evidence of his motive adduced by the state was not reliable because there were other possible explanations for each piece of evidence.

 The statutory phrase "the murder was committed in an effort to conceal" means that "the murder must have been committed for the purpose of hiding the fact of the commission of the separate crime." *State v. Farrar*, 309 Or 132, 183, 786 P2d 161, *cert den*, 498 US 879 (1990). In establishing that element, the state may rely on circumstantial evidence and reasonable inferences flowing from that evidence. *See Delgado v. Souders*, 334 Or 122, 135, 46 P3d 729 (2002); *State v. Beason*, 170 Or App 414, 425, 12 P3d 560 (2000), *rev den*, 331 Or 692 (2001). An inferred fact must be one that the jury is convinced follows beyond a reasonable doubt from the underlying facts. *State v. Lopez-Medina*, 143 Or App 195, 200, 923 P2d 1240 (1996). But the requirement that the jury be convinced beyond a reasonable doubt does not mean that a particular inference must inevitably follow from the established facts. *Beason*, 170 Or App at 423-24. Rather, the established facts may support multiple reasonable inferences and, if they do, which inference to draw is for the jury to decide. *State v. Hall*, 327 Or 568, 574, 966 P2d 208 (1998); *Beason*, 170 Or App at 425.

---

[3] ORS 163.095 provides, in part:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(2)(a) * * *

"* * * * *

"(e) The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime."

The evidence showed that, at the time of the murder, Bailey had substantial information about defendant's and Simpkins's drug possession and dealing. Defendant had much to fear from being arrested for drug dealing, given his significant criminal history. Defendant did not want to go to prison again, and he was afraid of the police. Defendant had expressed concern to Johns that Bailey might be a "snitch." Further, defendant had threatened to kill other people, including Johns and Atha's girlfriend, if they informed on him to the police. The day before Bailey was murdered, defendant told Caldwell that he did not want Bailey around any more because she was "driving him crazy." Moreover, when Atha confronted defendant with a rumor that defendant had killed Bailey so that she would not turn in Simpkins, defendant responded, "[W]ell, something like that."[4]

From the foregoing evidence, a rational factfinder could infer that defendant wanted Bailey out of his life, but he did not want to risk her reporting his or Simpkins's drug activity to the police. That proof of motive would enable a rational trier of fact to determine that defendant intentionally caused Bailey's death or aided and abetted Simpkins in doing so for the purpose of concealing the commission of one or more drug possession or delivery crimes. *See State v. Rose*, 311 Or 274, 283, 810 P2d 839 (1991) (proof of motive can furnish circumstantial evidence of criminal intent). The fact that other inferences also rationally could be drawn from the evidence does not require a different conclusion. *Hall*, 327 Or at 574. Therefore, the trial court did not err in denying defendant's motion for judgment of acquittal on count two.

■ In his second assignment of error, defendant asserts that the evidence was insufficient to prove that, as alleged in count one, he murdered Bailey as a result of intentional maiming. In its brief on appeal, the state argues that, if we conclude, as we have, that there was sufficient evidence to convict defendant of aggravated murder under count two, we need not reach defendant's second assignment of error. The

---

[4] At trial, defendant testified that his response was not intended as an admission. However, the jury was entitled to reject that assertion. *State v. Cunningham*, 320 Or 47, 63-64, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995).

state reasons that, even if the trial court erred in denying defendant's motion for judgment of acquittal with respect to count one, the error was harmless because the court merged defendant's convictions for purposes of sentencing. At oral argument, the state retreated from that position, conceding that the trial court's inclusion of both counts in the judgment as bases for defendant's aggravated murder conviction requires us to determine separately whether the evidence supported a conviction on each count. We accept that concession.

Where a defendant is found guilty of multiple counts of aggravated murder of the same victim there is but one crime. *State v. Barrett*, 331 Or 27, 34-36, 10 P3d 901 (2000). In such circumstances, the trial court should enter a single judgment of conviction reflecting the defendant's guilt on the aggravated murder charge, and the judgment should separately enumerate each of the aggravating factors that the trier of fact found to be proved. *Id.* at 37. Each basis for the conviction is subject to possible review at successive stages of appellate and collateral proceedings. Therefore, it is necessary to determine independently the validity of each basis for the conviction that defendant has challenged. *Id.*; *see also State v. Lotches*, 331 Or 455, 471-72, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (court found error prejudicial as to some but not all aggravated murder counts that alleged the murder of a single victim). Accordingly, we turn to the merits of defendant's challenge to the sufficiency of the evidence to support his conviction on count one.

In count one, the state charged defendant with aggravated murder by "intentional maiming." ORS 163.095(1)(e) provides that aggravated murder is committed where "[t]he homicide occurred in the course of or as a result of intentional maiming or torture of the victim." Defendant argues that the state's evidence was deficient in two respects. First, defendant argues that the state failed to prove that Bailey was maimed with an objective that was distinct from the objective to murder her. Second, defendant asserts that the state failed to prove that Bailey was "maimed" within the meaning of ORS 163.095(1)(e). Because they are inextricably connected, we consider those arguments jointly.

The meaning of the statutory term to "maim" is a question of law. In making that determination, we begin with the text of the statute in context. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We give words of common usage their "plain, natural, and ordinary meaning." *Id.* at 611. "As a part of context, [a] court considers, among other things, other provisions of the same statute, other related statutes, prior versions of the statute, and this court's decisions interpreting the statute." *Jones v. General Motors Corp.*, 325 Or 404, 411, 939 P2d 608 (1997). Additionally, "any prior judicial construction of the same or similar language" by the Supreme Court is relevant to our examination. *Magee v. Dyrdahl*, 144 Or App 270, 275, 926 P2d 319 (1996).

Although "maim" is not defined by statute, its ordinary meaning is "to wound seriously : MUTILATE, DISABLE, DISFIGURE[.]" *Webster's Third New Int'l Dictionary* 1362 (unabridged ed 1993). Defendant argues that, "because killing someone in the course of or as a result of intentional maiming makes a murder [more culpable], the legislature [must] have intended maim to mean more than disfigurement or wounding that necessarily accompanies most murders." Although maiming often consists of mutilation or disfigurement, its ordinary meaning is broader than those concepts. By its terms, maiming also includes the "serious" wounding of a person. Here, Bailey suffered three extremely painful and deep stab wounds. The stab wound to her head penetrated her skull. The wound to her chest punctured her lung. Moreover, the chest wound also disabled Bailey by making it difficult, and eventually impossible, for her to breathe. Based on that evidence, the state argues, a rational factfinder could determine that Bailey was maimed within the meaning of the statute.

Assuming without deciding that the state is correct, the statute requires more for aggravation; it demands that the maiming be "intentional." In regard to that requirement, the Supreme Court's decision in *State v. Cornell / Pinnell*, 304 Or 27, 741 P2d 501 (1987), is instructive. In that case, the court considered the sufficiency of the evidence to prove that a murder victim was "tortured" within the meaning of ORS

163.095(1)(e). The court first adopted the ordinary meaning of the word, namely the "inflic[tion of] intense physical pain upon an unwilling victim." *Id.* at 32. However, the court held that proof of an act that might constitute torture was not, alone, sufficient to satisfy the statute:

> "Not every infliction of intense physical pain, even through an intentional act known by the actor to be intensely painful, qualifies as 'torture.' The act must be intentional, of course, but the word 'torture' itself connotes that the infliction of pain is one reason for the defendant's intentional act. To utilize the statute, the state must prove that the perpetrator had this objective apart from responsibility for the death of the victim."

*Id.*; *see also State v. Montez*, 309 Or 564, 600, 789 P2d 1352 (1990) (holding that, to find the aggravating factor of intentional torture under ORS 163.095(1)(e), there must be evidence "that a perpetrator 'separately intended to inflict intense physical pain on an unwilling victim' apart from the murder itself").

■ Because the aggravating factor of maiming is part of the same statutory subsection as the torture factor, there is no reason to ascribe a different legislative intent regarding proof of maiming. *See PGE*, 317 Or at 611. To prove the aggravating factor of intentional maiming, then, the state must offer evidence of a perpetrator's intent apart from the murder itself. We turn to the issue whether the evidence in this case was sufficient to make that showing.

Here, there was no evidence that defendant or Simpkins had any intention to seriously wound, mutilate, disable, or disfigure Bailey apart from an intention to cause her death. The fact that she was stabbed three times does not furnish that proof; two of the wounds were potentially lethal, and there is no reason to believe that the stab wound to Bailey's neck was intended to cause any result other than death. Nor did any other evidence, direct or circumstantial, support a different inference.

The Supreme Court's decision in *State v. Langley*, 314 Or 247, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993), supports our conclusion. In *Langley*, the court considered the sufficiency of the evidence to support an

aggravated murder conviction based on torture. *Id.* at 267-69. The victim was murdered by asphyxiation, and the issue was whether the evidence showed that the defendant had a separate intent to torture her. The victim's body had been elaborately bound in a tight fetal position by ropes and knots to prevent any movement, and her mouth and head were covered with tape. The court stated that the "number and tightness" of the bindings went far beyond what was necessary to prevent escape and that a rational factfinder could infer that the defendant applied the bindings with an intent to cause intensely painful muscle cramping. *Id.* at 268. As pertinent here, the court stated:

> "Although the two medical witnesses testified that death by asphyxiation takes three to five minutes and is painful, we agree with defendant that evidence of intentional asphyxiation is not, in and of itself, evidence of torture, *i.e.*, an intent to inflict intense physical pain. *Absent other circumstances, murder by asphyxiation is not substantively different than murder by stabbing or shooting or bludgeoning. In each instance, the victim may well suffer several minutes of pain and terror before succumbing. The focus of a torture inquiry is not on the defendant's intent to cause the victim's death, but on the defendant's separate intent to cause intense physical pain.*"

*Id.* (emphasis added).

Although *Langley* involved alleged torture, rather than maiming, its essential point is applicable here. It is not enough to support a conviction for aggravated murder under ORS 163.095(1)(e) merely to show that a stabbing victim suffered protracted pain before succumbing. Because there was no evidence that defendant harbored a separate intent to maim the victim apart from his intent to cause her death, the trial court erred in denying defendant's motion for judgment of acquittal as to count one.

Judgment of conviction for aggravated murder on count one reversed; judgment of conviction for aggravated murder on count two affirmed; remanded for entry of corrected judgment; otherwise affirmed.