Submitted on record and briefs November 30, 2006, vacated and remanded for merger and resentencing; otherwise affirmed July 11, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JUSTIN ALAN LINK,
*Defendant-Appellant.*

Deschutes County Circuit Court
01FE0371AB; A123223

162 P3d 1038

Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, Legal Services Division, and Susan F. Drake, Senior Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Senior Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

Defendant appeals from his convictions for numerous crimes—aggravated murder, conspiracy to commit aggravated murder, attempted murder, assault, kidnapping, robbery, burglary, and theft—related to events occurring in March 2001, when he and four of his friends, later his codefendants, entered the Deschutes County house belonging to the mother of one of the friends, vandalized it while they waited for her to come home from work, beat her when she returned and then shot her to death, stole some of her property, stole her car, and fled to Canada, where they were detained and apprehended by Canadian authorities on the Canadian side of the border and later turned over to Oregon authorities. Defendant assigns error to the court's denial of his motion for a judgment of acquittal and its subsequent guilty verdict on three counts of aggravated murder, its denial of his motion to suppress evidence assertedly derived from a violation of the extradition treaty between the United States and Canada, and its failure to merge certain of the convictions. As the state correctly concedes, the court erred in not merging the convictions as defendant argues. We reject defendant's other assignments of error. Therefore, we vacate defendant's sentences, remand for merger and resentencing, and otherwise affirm.

The facts, stated in the light most favorable to the state, *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994), are as follows. In March 2001, defendant and his friend Adam Thomas, the son of the victim in this case, were living in a motel in Deschutes County. Thomas had recently moved out of his mother's house because he was not getting along with her, due in part to her antipathy toward defendant. At some time during the morning of March 26, 2001, defendant, then 17 years old, along with Thomas and three other friends—Summers, age 15; Koch, age 15; and Karle, age 16—entered the victim's house while she was at work. The five friends had decided to drive Koch's mother's Cadillac (which Koch had taken from her and not returned) to Canada, and they had stopped at the victim's house to shower, get food, and steal valuables.

Shortly after they arrived, defendant and two of his friends decided to make a trip to the store to buy cigarettes. As they were about to leave, defendant handed another one of his friends, Karle, a .308 rifle—stolen earlier from a shop owned by Thomas's father and later used to kill the victim—and told her to shoot anybody who might arrive during the errand. When Karle asked who that might be, defendant named the victim. However, the errand never took place; nobody could find the keys to the Cadillac in which the friends had arrived. At defendant's suggestion, they ransacked the house looking for the keys, but to no avail. At that point, they decided to wait for the victim to return, knock her out, and go to Canada in her other car.

Defendant, however, told the others that merely knocking the victim unconscious and tying her up would not be sufficient; rather, they had to kill her so that she could not have them apprehended. As the discussion continued, the five friends suggested various ways to accomplish the murder: beating the victim to death with empty wine bottles, injecting her with bleach, setting the house on fire with her inside, and electrocuting her by immersing her in the bathtub and then also immersing plugged-in appliances. Defendant told them, however, that, if all else failed, they should shoot her.

As the late morning and afternoon passed, defendant instructed his friends how they should go about setting up the house for the planned murder. Wine bottles were emptied; a hypodermic needle was filled with bleach; the bathtub was filled and electrical cords brought into the bathroom and connected to a hair dryer and radio. Shortly before the victim's expected return, two of the codefendants stationed themselves as lookouts so they could alert the others to the victim's approach; two stationed themselves where they could hit her when she entered; and defendant, telling the others that he could not be seen in the house, stationed himself outside, where he stayed in contact with the others by cellphone. At one point, he telephoned Koch and delivered what Koch later described as a "pep talk," encouraging him to carry out their plans.

When the victim arrived, Thomas and Koch hit her between four and six times with the empty wine bottles and, when she fell to the ground, kicked her. Despite the attack, however, she was able to stand and get to the back porch. From his vantage point outside, defendant saw her, and asked Thomas and Koch, who by now were also on the porch, "Why isn't she dead yet? Get her back in the house. Shoot her. Get the gun." As Koch went to retrieve the rifle, defendant told Thomas that the victim looked "really bad" and that they should put her out of her misery. After Thomas, Summers, and Karle either refused or were unable to shoot the victim, Koch did so himself. Defendant remained outside.

After the murder, the five young people took a cordless phone, alcohol, guns, jewelry, and money from the residence, transferred their belongings from the Cadillac to the victim's Honda, and drove away.

At around 9:30 p.m. that evening, police, having discovered the victim's body, placed an "attempt to locate" message for defendant and the four codefendants on state and national law enforcement computer systems. By early the next morning, Deschutes County authorities had issued a temporary felony warrant for the arrest of all five and entered the warrant into the same state and national computer systems.

The five fugitives reached the Canadian customs station at a point of entry on the Washington-British Columbia border at approximately 12:30 p.m. on March 27, 2001, the day after the murder. They were routinely stopped at the station within Canadian territory. The customs inspector noticed that the driver, Thomas, appeared nervous, as did all of the passengers; that only Thomas had a driver's license with him; and that two of the passengers appeared quite young. He detained all five and then ran Thomas's name through the computer. That led to the discovery that Thomas and four other unnamed persons were suspects in a murder. He took the youths to five separate rooms, where they were handcuffed.

The Canadian authorities then put defendant under arrest and read him the Canadian equivalent of *Miranda* warnings, called "charter rights" and "cautions":

"You are not obligated to say anything. You have nothing to hope from any promise or favor and nothing to fear from any threat, whether or not you say anything. Anything you do say may be used as evidence. You have the right to retain and instruct counsel without delay. You have the right to obtain legal advice without charge from duty counsel."

Defendant did not request an attorney. The Canadian officials did not interrogate or interview him except to ascertain his real name. At approximately 2:00 p.m., defendant and the four codefendants were walked over to the United States Customs building on the United States side of the border. Defendant was kept at the United States customs station until approximately 5:00 p.m., when Whatcom County Sheriff's Office detectives picked him up, arrested him, advised him of his right to counsel, and transported him to the Whatcom County Sheriff's Department.

Members of the Deschutes County Major Crimes Team arrived at the Whatcom County Sheriff's Department around 8:30 p.m. A detective with the Deschutes County Sheriff's Office advised defendant of his *Miranda* rights and then began interrogating him about his role in the murder. He was ultimately tried and convicted of five counts of aggravated murder, ORS 163.095; five counts of conspiracy to commit aggravated murder, ORS 161.450; two counts of attempted murder, ORS 161.405; one count of assault in the second degree, ORS 163.175; one count of kidnapping in the first degree, ORS 163.235; three counts of robbery in the first degree, ORS 164.415; three counts of burglary in the first degree, ORS 164.225; and two counts of theft in the first degree, ORS 164.055. At sentencing, the trial court agreed with defendant's arguments that various counts should merge, but entered a judgment showing that they merged only "for sentencing." This appeal ensued.

■ We begin with defendant's fifth assignment of error, because it is the only one that would have an impact on all of defendant's convictions and, therefore, all of his other assignments of error. In that assignment, defendant argues that the court erred in denying his motion to suppress statements and other evidence that he claims derived from a violation of

the extradition treaty between Canada and the United States. The relevant Articles of the treaty are:

"ARTICLE 1

"Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty [including murder] committed within the territory of the other * * *.

"* * * * *

"ARTICLE 8

"The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

"ARTICLE 9

"(1)   The request for extradition shall be made through the diplomatic channels.

"(2)   The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

"(3)   When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State * * *."

Treaty on Extradition, Dec 3, 1971, United States - Canada, 27 UST 983, TIAS No 8237 (entered into force Mar 22, 1976), and Protocol Amending the Treaty on Extradition, Jan 11, 1988, United States - Canada, S Treaty Doc No 101-17 (1990) (entered into force Nov 26, 1991) (together, the "US-Canada Extradition Treaty").

■      In order to prevail on that assignment of error, defendant must establish *all* of the following: Canadian or United States officials violated the treaty; the treaty confers rights

that are enforceable by individuals; the disputed evidence derived from the violation; suppression of the evidence is the appropriate remedy for vindicating a violation of the treaty; and the trial court's denial of suppression was prejudicial to defendant. We conclude that the treaty does not confer rights that are enforceable by individuals. We therefore need not and do not decide any other issue.

Our decision is informed by the Supreme Court's conclusion that a different treaty, the Vienna Convention on Consular Relations (VCCR), does not confer individual rights. *State v. Sanchez-Llamas*, 338 Or 267, 108 P3d 573 (2005), *aff'd*, ___ US ___ , 126 S Ct 2669, 165 L Ed 2d 557 (2006).[1] As we explain below, we conclude that the differences between the VCCR and the United States - Canada Extradition Treaty, while obvious, do not result in a different determination regarding conferral of individual rights.

The *Sanchez-Llamas* court began with the observation that the question whether a treaty creates individual rights is an issue of federal law, and that the federal cases "suggest" that treaties permit enforcement by an individual right of action "only when a specific intent to create such individual rights can be discerned from the treaty as a whole." *Sanchez-Llamas*, 338 Or at 272. In examining treaties to determine whether they demonstrate such an intent, "the general rule, widely recognized in the federal courts, is that rights created by international treaties belong to the signatory state and are *not* enforceable in American courts by private individuals." *Id.* (citing *Edye v. Robertson*, 112 US 580, 598-99, 5 S Ct 247, 28 L Ed 798 (1884)) (emphasis in original). Exceptions to the rule occur only when the treaties contain "explicit wording" creating individual rights or when their provisions "necessarily imply" that interpretation. *Id.* at 274.

---

[1] The United States Supreme Court's decision rested on the majority's conclusion that, even if the VCCR created individual rights, it did not require suppression of evidence obtained in violation of those rights. The Court's decision therefore leaves undisturbed the Oregon Supreme Court's conclusion regarding the existence of individual rights.

Defendant argues that, although these guidelines may apply to the VCCR, they do not apply to extradition treaties. To support that assertion, defendant quotes *United States v. Alvarez-Machain*, 504 US 655, 667, 112 S Ct 2188, 119 L Ed 441 (1992): "The [Mexico - United States] Extradition Treaty has the force of law, and if * * * it is self-executing, it would appear that a court must enforce it on behalf of an individual[.]" We find the quotation unpersuasive for several reasons. First, it is *dictum*, appearing in a case in which the Court's holding has nothing to do with whether any treaty confers individual rights; the Court ruled *against* the individual defendant, a foreign national, on the ground that the United States did not violate the extradition treaty when it kidnapped him. *Id.* at 670. Second, it is speculative *dictum*; the Court noted only that it "would appear" that a self-executing treaty confers individual rights. *Id.* at 667. And third, a "self-executing" treaty *is defined as* a treaty that confers individual rights, *Sanchez-Llamas*, 338 Or at 272, and the Oregon Supreme Court's guidelines instruct us about how we are to go about deciding if a treaty meets the definition. The court stated that non-self-executing treaties do not confer individual rights, and then explained how to determine whether a treaty is or is not self-executing.

Applying those guidelines, the court in *Sanchez-Llamas* rejected the defendant's argument that the VCCR's explicit *reference to* individual rights compels the conclusion that the convention *confers* those rights on individuals. 338 Or at 274-75. The defendant pointed specifically to a provision stating that an arrested foreign national could communicate with his or her consulate and that the consulate had to be informed of the arrest, followed by a provision referring to those prerogatives as "rights referred to in paragraph 1 of this Article" and stating that they " 'shall be exercised in conformity with the laws and regulations of the receiving state.' " *Id.* at 271 (quoting VCCR, Article 36, section 2). The court held:

> "Although defendant is correct that Article 36 expressly refers to the detained foreign national's 'rights' to consular access and notification, the mere use of the term 'rights' cannot, by itself, support an intent to require signatory states to allow individual detainees to enforce those 'rights'

in a criminal proceeding against them—particularly when the treaty does not specify the nature of the declared 'rights' or any remedy that is required for their breach. In fact, it seems likely that the treaty refers to a detainee's 'rights' to consular access and notification purely because that is the most convenient and comprehensible way of describing what a receiving signatory state must tell a foreign detainee in order to meet the signatory state's obligations under the treaty."

*Sanchez-Llamas*, 338 Or at 274-75.

In the present case, defendant relies on the statement in Article 8 that "[t]he determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law." Viewing this language in light of the court's rule that rights in international treaties presumptively "belong to the signatory state and are *not* enforceable in American courts by private individuals," *id.* at 272 (emphasis in original), and in light of its treatment of similar language in the VCCR, we conclude that the reference to "the right to use all remedies and recourses" is a "convenient and comprehensible" way of describing the requested state's obligations.

We agree with the state's observation: "Although Article 8 may benefit an individual, any right arising from it is merely derivative through the signatory states." That is particularly true in light of the overarching purpose of the treaty, as stated in the Preamble: to "make more effective the cooperation of the two countries in the repression of crime by making provision for the reciprocal extradition of offenders[.]" Finally, and in any event, the rights to which Article 8 refers are not rights against self-incrimination or unreasonable searches under the laws of the United States or Oregon: rather, they are rights provided by the requested state's law—here, *Canada's*. In sum, we conclude that the extradition treaty does not confer on defendant any right that is privately enforceable in American courts.

We turn to defendant's last four assignments of error (numbers six through nine) because our disposition of them

also disposes of his first four assignments. In the last assignments, defendant argues that the trial court should have merged several of his convictions. In particular, he argues that Counts 2 through 5 should all merge into Count 1, because the counts allege only different theories of the same crime, aggravated murder. Counts 1, 2, and 3 allege aggravated murder based on the theory that defendant committed murder during the commission of other crimes—so-called "felony murder," ORS 163.115(1)(b)—elevated to aggravated murder because defendant "personally" participated in the murder. ORS 163.095(2)(d). Counts 4 and 5 allege that defendant committed aggravated murder based on the theory that he murdered the victim in an attempt to conceal the commission of crimes and the identity of the perpetrator. ORS 163.095(2)(e). As defendant points out, the trial court agreed with defendant at sentencing that the counts should merge as defendant argued, but the judgment shows that separate convictions were entered and the counts were merged only "for sentencing purposes." The state "agrees that the trial court erred in failing to merge the convictions in the manner defendant now urges," and we agree as well. *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000). Thus, the court should have entered only a single conviction, listing the different aggravating factors. *State v. Garner*, 194 Or App 268, 276, 94 P3d 163, *rev den*, 337 Or 616 (2004).

For the same reason, Counts 6 through 10, each alleging conspiracy to commit aggravated murder based on theories corresponding to the theories in Counts 1 through 5, should have merged into each other. Further, that single conviction should have merged into Count 1 as well. ORS 161.485 (mandating single conviction for actual commission of an offense and conspiracy to commit that offense). Counts 19 and 20, charging burglary in the first degree, should have merged into Count 18, which charged the same crime. And Counts 11 and 12, charging attempted murder, should have merged into the conviction for felony murder, Count 1.

One result of this conclusion is that we must remand for merger and resentencing. More significantly, the conclusion also disposes of defendant's first four assignments of error. Defendant's first two assignments of error are based on the argument that he did not commit aggravated murder as

defined in ORS 163.095(2)(d), which, as explained above, elevates murder to aggravated murder when a person "personally" engages in so-called "felony murder," that is, murder during the commission of specified other crimes. ORS 163.115(1)(b). According to defendant, he did not "personally" participate in felony murder because he did not directly inflict injury on the victim; he merely was present when the murder occurred. The state responds that, under two Supreme Court cases, *State v. Nefstad*, 309 Or 523, 789 P2d 1326 (1990), *cert den*, 516 US 1081 (1996), and *State v. Pine*, 336 Or 194, 82 P3d 130 (2003), a defendant "personally" commits felony murder if he or she engages in conduct so extensively intertwined with the murder that the conduct can be said to have produced it.

We need not decide that dispute, however, because defendant explicitly does *not* assign error to his convictions on Counts 4 and 5, aggravated murder based on the attempt to conceal the crimes or the identity of the perpetrator. Thus, even if defendant is correct that the court erred in not acquitting him on Counts 1 through 3, he would still stand convicted on Counts 4 and 5. Because all of the counts merge into a single conviction, resulting in a single sentence, acquittal on Counts 1 through 3 would not affect a substantial right of defendant. We therefore could not reverse his conviction for aggravated murder. ORS 138.230 (directing court to disregard defects that do not affect party's substantial rights); *see also* Or Const, Art VII (Amended), § 3 (Supreme Court must affirm notwithstanding harmless error); *State v. Culver*, 198 Or App 267, 271, 108 P3d 104 (2005) (applying constitutional harmless error rule to Court of Appeals decisions). By the same logic, any error in not acquitting defendant on Counts 6 through 8—the asserted errors in defendant's assignments of error 3 and 4—would not affect a substantial right.

In response to questions from the court, the parties suggest that a decision on the first four assignments of error could affect a substantial right of defendant because, should he ultimately succeed in a post-conviction proceeding in obtaining a reversal on Counts 4 and 5, then his convictions on Counts 1, 2, 3, 6, 7, or 8 would prevent his complete vindication as to the aggravated murder convictions. The parties

cite *Garner*, 194 Or App at 273-74. In that case, the defendant was convicted of two counts of aggravated murder, each based on a different aggravating factor. *Id.* at 270. He appealed, assigning error to the verdict on both counts. We affirmed as to one count and reversed as to the other. *Id.* at 279. We also held that, even though the counts merged, each one had to be decided, because "[e]ach basis for the conviction is subject to possible review at successive stages of appellate and collateral proceedings." *Id.* at 276.

The present case is different. The defendant in *Garner* appealed from his convictions based on the grounds that both counts were wrongly decided, thereby preserving his option to reassert each of those grounds in his petition for post-conviction relief. ORS 138.550. Defendant, however, did not appeal his convictions on the grounds that he was wrongly found guilty on Counts 4 or 5. He is therefore barred from seeking post-conviction relief on those grounds. *Id.*; *Palmer v. State of Oregon*, 318 Or 352, 867 P2d 1368 (1994). Further, because the trial court found as fact that defendant committed the murders in order to prevent the victim from revealing the perpetrators of the robbery and other crimes, and that finding is supported by evidence in the record, the possibility of actually *achieving* meaningful post-conviction relief, even if it were possible to pursue it, would be so remote as to be essentially nonexistent.

Vacated and remanded for merger and resentencing; otherwise affirmed.