Argued and submitted November 4, 2008, decision of Court of Appeals affirmed
in part and reversed in part; judgment of circuit court affirmed in part and reversed
in part, and case remanded to circuit court for further proceedings May 7, 2009

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## JUSTIN ALAN LINK,
*Petitioner on Review.*

(CC 01FE0371AB; CA A123223; SC S055516)

208 P3d 936

Susan F. Drake, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services, Legal Services Division.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

WALTERS, J.

**WALTERS, J.**

Defendant was a teenager when he and four friends stole a car belonging to one friend's mother, killed her to conceal the robbery, and drove to Canada. Although defendant took part in the preparations to commit the murder and encouraged and directed the others to shoot the victim, he was not physically present when, after three of his friends either refused or were unable to shoot her, the fourth fired the fatal shot. Defendant was charged with five counts of aggravated murder. Counts 1 through 3 charged defendant with aggravated felony murder—specifically, that defendant had committed first-degree robbery by three different means and that, in the course of committing each of those felonies, he had committed the murder of the victim "personally and intentionally." *See* ORS 163.095(2)(d) (1999) (defining felony murder under those circumstances as aggravated murder).[1] Counts 4 and 5 charged that defendant had killed the victim to conceal the commission of other crimes (Count 4) and the identity of the perpetrators of those crimes (Count 5). *See* ORS 163.095(2)(e) (defining murder under those circumstances as aggravated murder). After a bench trial, the trial court convicted defendant of aggravated murder on all five counts.

On appeal to the Court of Appeals, defendant challenged his convictions on Counts 1 through 3, contending that the evidence adduced at trial was insufficient to establish that he had committed the murder "personally" and that the trial court therefore had erred in denying his motion for judgment of acquittal on those three counts. Defendant did not challenge his aggravated murder convictions on Counts 4 or 5. The Court of Appeals concluded that defendant would stand convicted of aggravated murder and receive the same sentence regardless of whether his convictions on Counts 1 through 3 were reversed. The court therefore declined to reach the issue of the sufficiency of the evidence on those counts. *State v. Link*, 214 Or App 100, 162 P3d 1038 (2007).

---

[1] Unless otherwise noted, all references to the Oregon Revised Statutes are to the 1999 version in effect when the crimes were committed. ORS 163.095 has since been amended. Or Laws 2005, ch 264, § 17.

We allowed defendant's petition for review and now hold that (1) the Court of Appeals should have reached the merits of defendant's challenge to the sufficiency of the evidence on Counts 1 through 3; and (2) the trial court erred in denying defendant's motion for judgment of acquittal on Counts 1 through 3.

## FACTS AND PROCEDURAL BACKGROUND

Because the parties do not contest the accuracy of the statement of facts by the Court of Appeals, we take the facts from its opinion.

"In March 2001, defendant and his friend * * * Thomas, the son of the victim in this case, were living in a motel in Deschutes County. Thomas had recently moved out of his mother's house because he was not getting along with her, due in part to her antipathy toward defendant. At some time during the morning of March 26, 2001, defendant, then 17 years old, along with Thomas and three other friends—Summers, age 15; Koch, age 15; and Karle, age 16—entered the victim's house while she was at work. The five friends had decided to drive Koch's mother's Cadillac (which Koch had taken from her and not returned) to Canada, and they had stopped at the victim's house to shower, get food, and steal valuables.

"Shortly after they arrived, defendant and two of his friends decided to make a trip to the store to buy cigarettes. As they were about to leave, defendant handed another one of his friends, Karle, a .308 rifle—stolen earlier from a shop owned by Thomas's father and later used to kill the victim—and told her to shoot anybody who might arrive during the errand. When Karle asked who that might be, defendant named the victim. However, the errand never took place; nobody could find the keys to the Cadillac in which the friends had arrived. At defendant's suggestion, they ransacked the house looking for the keys, but to no avail. At that point, they decided to wait for the victim to return, knock her out, and go to Canada in her other car.

"Defendant, however, told the others that merely knocking the victim unconscious and tying her up would not be sufficient; rather, they had to kill her so that she could not have them apprehended. As the discussion continued, the five friends suggested various ways to accomplish the murder: beating the victim to death with empty wine bottles,

injecting her with bleach, setting the house on fire with her inside, and electrocuting her by immersing her in the bathtub and then also immersing plugged-in appliances. Defendant told them, however, that, if all else failed, they should shoot her.

"As the late morning and afternoon passed, defendant instructed his friends how they should go about setting up the house for the planned murder. Wine bottles were emptied; a hypodermic needle was filled with bleach; the bathtub was filled and electrical cords brought into the bathroom and connected to a hair dryer and radio. Shortly before the victim's expected return, two of the codefendants stationed themselves as lookouts so they could alert the others to the victim's approach; two stationed themselves where they could hit her when she entered; and defendant, telling the others that he could not be seen in the house, stationed himself outside, where he stayed in contact with the others by cellphone. At one point, he telephoned Koch and delivered what Koch later described as a 'pep talk,' encouraging him to carry out their plans.

"When the victim arrived, Thomas and Koch hit her between four and six times with the empty wine bottles and, when she fell to the ground, kicked her. Despite the attack, however, she was able to stand and get to the back porch. From his vantage point outside, defendant saw her, and asked Thomas and Koch, who by now were also on the porch, 'Why isn't she dead yet? Get her back in the house. Shoot her. Get the gun.' As Koch went to retrieve the rifle, defendant told Thomas that the victim looked 'really bad' and that they should put her out of her misery. After Thomas, Summers, and Karle either refused or were unable to shoot the victim, Koch did so himself. Defendant remained outside.

"After the murder, the five young people took a cordless phone, alcohol, guns, jewelry, and money from the residence, transferred their belongings from the Cadillac to the victim's Honda, and drove away."

214 Or App at 102-04.

Defendant and his cohorts were captured as they attempted to enter Canada. They were each indicted on 22 criminal counts, including the five counts of aggravated

murder previously described and five counts of conspiracy to commit aggravated murder.[2]

Defendant was tried separately from the others and waived his right to a jury trial. At the close of the state's evidence, defendant moved for a judgment of acquittal on all counts. As to Counts 1 through 3, the three counts charging aggravated felony murder, defendant contended that there was no evidence from which a rational factfinder could conclude that he had "personally * * * committed" the murder, as is required by ORS 163.095(2)(d) (felony murder is aggravated murder if defendant "personally and intentionally committed the homicide").[3] Defendant asserted that, under that subsection of the statute, only the person who fired the fatal shot could be convicted.

The state disagreed. It contended that, under *State v. Nefstad*, 309 Or 523, 789 P2d 1326 (1990), the requirement

---

[2] The five counts of aggravated murder alleged:

Count 1: that defendants committed the crime of Robbery in the First Degree as defined in ORS 164.415(1)(a) while armed with a deadly weapon (a firearm), and in the course of and in furtherance of that crime, defendants personally and intentionally caused the death of the victim.

Count 2: that defendants committed the crime of Robbery in the First Degree as defined in ORS 164.415(1)(b) by use of a dangerous weapon (a bottle), and in the course of and in furtherance of that crime, defendants personally and intentionally caused the death of the victim.

Count 3: that defendants committed the crime of Robbery in the First Degree as defined in ORS 164.415(1)(c) and caused serious physical injury to the victim, and in the course of and in furtherance of that crime, defendants personally and intentionally caused the death of the victim.

Count 4: that defendants intentionally caused the death of the victim to conceal the crimes of theft, criminal mischief, assault, robbery, and unauthorized use of a vehicle.

Count 5: that defendants intentionally caused the death of the victim to conceal the identity of a perpetrator of the crimes of theft, criminal mischief, assault, robbery, and unauthorized use of a vehicle.

[3] ORS 163.095 provides, in part:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(2) * * *

"(d) Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b) [the felony murder statute]."

that a defendant act "personally" could be met by other active involvement in the murder. The evidence, the state argued, was sufficient to permit a factfinder to conclude that defendant's actions constituted active involvement in the victim's murder.

The trial court agreed with the state, denied the motion for judgment of acquittal, and convicted defendant on all 22 counts.[4] Conviction of aggravated murder requires one of three sentences: death, life imprisonment without the possibility of release or parole, or life imprisonment. ORS 163.105(1)(a). Defendant was not eligible for the death penalty by virtue of ORS 137.707(2) (prohibiting death penalty for defendant who was under 18 years of age when crime was committed). The trial court sentenced him to life imprisonment without the possibility of release or parole.

During the sentencing phase of the trial, defendant argued that the five aggravated murder counts (plus other counts) should be merged into a single conviction for aggravated murder. Defendant relied on this court's decision in *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000). The state did not argue to the contrary. In fact, the state specifically "agree[d] that all five counts of Aggravated Murder [should] merge for sentencing purposes."

Because the exact nature of the "merger" that the law requires is relevant to our disposition here, we pause to consider *Barrett* and its application of the "anti-merger statute" in some detail. That statute, currently codified as ORS 161.067(1), but discussed in *Barrett* as also codified in *former* ORS 161.062(1) (1997), provides:

> "When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."[5]

___

[4] In announcing its decision finding defendant guilty of aggravated murder, the trial court concluded that defendant was not "the ringleader, controlling and dictating [to] the other four. I think more likely it was a situation of pack mentality at its worst."

[5] The first sentence of *former* ORS 161.062(1) (1997) was identical to ORS 167.067(1); the statutes were adopted in 1985 and 1986, respectively. *Former*

In *Barrett*, the defendant had been convicted of three counts of aggravated murder (among other crimes) for killing a single victim. This court concluded that a defendant's murder of one victim, even though attended by multiple aggravating circumstances, does not violate two or more statutory provisions as required to constitute two or more separately punishable offenses under *former* ORS 161.062 (1997); therefore, the trial court had erred in imposing separate sentences for each aggravated murder conviction. 331 Or at 29-31.

The court in *Barrett* nevertheless concluded that the judgment needed to reflect the full extent of the defendant's crime:

> "Each of the three theories of aggravated murder at issue here is one on which the jury had to agree unanimously. If the trial court were to enter a conviction on only one count, and dismiss the other two, it always would be possible that an appeal would result in a reversal, for insufficient evidence, of the count that was selected to serve as the basis for conviction. With the other two counts dismissed, defendant would be able to argue that he was entitled to a judgment of acquittal on the charge of aggravated murder. Such an outcome would be inappropriate, if there were evidence to sustain defendant's guilt under either of the other two counts, but there is no obvious mechanism for 'reviving' counts that have been dismissed."

*Id.* at 36-37 (citation omitted). To address that possibility, the court concluded that the "appropriate procedure" is "to enter one judgment of conviction reflecting the defendant's guilt on the charge of aggravated murder, which judgment separately would enumerate each of the existing aggravating factors." *Id.* at 37 (footnote omitted).

Here, the trial court did not follow precisely the procedure described in *Barrett*. In the trial court's judgment of conviction and sentence, the court sentenced defendant to life without the possibility of parole on the first aggravated murder count, Count 1. The court then separately listed convictions on each of the four remaining aggravated felony murder

---

ORS 161.062(1) (1997) was repealed by Oregon Laws 1999, chapter 136, section 1. ORS 167.067(1) remains unchanged. *See State v. Crotsley*, 308 Or 272, 276 n 3, 779 P2d 600 (1989) (discussing history of adoption of both statutes).

convictions, Counts 2 through 5, noting for each one that those counts "merge into COUNT [1] for sentencing purposes."[6]

On appeal, defendant presented two issues pertinent to the disposition of this case. First, defendant argued that the trial court had erred when it denied defendant's motion for judgment of acquittal on the three aggravated felony murder counts, Counts 1 through 3. Defendant renewed his assertion that there was no evidence from which a rational trier of fact could have found that he "personally * * * committed" the murder, as required by ORS 163.095(2)(d). Second, defendant maintained that the trial court had erred by not merging the aggravated murder convictions. Under *Barrett*, defendant argued, the trial court should have entered a single judgment of conviction for aggravated murder, then listed the aggravating factors found in the five aggravated murder counts.

The state disagreed with defendant concerning the trial court's ruling on the motion for judgment of acquittal as to Counts 1 through 3, but it concurred with defendant regarding the merger issue. The trial court, the state agreed, should have merged the five aggravated murder counts by entering a single judgment of conviction for aggravated murder that listed each aggravating factor.

After the Court of Appeals took the case under advisement, that court asked the parties to address whether merger of Counts 1 through 5 would mean that any error in denying the motion for judgment of acquittal as to Counts 1 through 3 was harmless—specifically, whether merger would mean that any error did not affect a substantial right of the parties, as is required to serve as a basis for reversal under ORS 138.230 and Article VII (Amended), section 3, of the Oregon Constitution. The parties agreed that any error was not harmless.

In its opinion, the Court of Appeals concluded that the trial court should have merged the aggravated murder counts, Counts 1 through 5, into a single conviction that

---

[6] The trial court merged other counts similarly, but the details of those mergers are not relevant to the issues on review.

listed the different aggravating factors for all five counts. *Link*, 214 Or App at 110 (relying on this court's decision in *Barrett*). The Court of Appeals held, however, that, the agreement of the parties notwithstanding, merger rendered harmless any error by the trial court in denying defendant's motion for judgment of acquittal:

> "[D]efendant explicitly does *not* assign error to his convictions on Counts 4 and 5, aggravated murder based on the attempt to conceal the crimes or the identity of the perpetrator. Thus, even if defendant is correct that the court erred in not acquitting him on Counts 1 through 3, he would still stand convicted on Counts 4 and 5. Because all of the counts merge into a single conviction, resulting in a single sentence, acquittal on Counts 1 through 3 would not affect a substantial right of defendant. We therefore could not reverse his conviction for aggravated murder. ORS 138.230 (directing court to disregard defects that do not affect party's substantial rights); *see also* Or Const, Art VII (Amended), § 3 (Supreme Court must affirm notwithstanding harmless error); *State v. Culver*, 198 Or App 267, 271, 108 P3d 104 (2005) (applying constitutional harmless error rule to Court of Appeals decisions)."

*Link*, 214 Or App at 111 (emphasis in original).

In their arguments to the Court of Appeals, the parties had suggested that acquittal on Counts 1 through 3 would affect a substantial right of defendant because, "should [defendant] ultimately succeed in a post-conviction proceeding in obtaining a reversal on Counts 4 and 5, then his convictions on Counts 1, 2, [or] 3 * * * would prevent his complete vindication as to the aggravated murder convictions." *Id.* The Court of Appeals rejected that argument, because it concluded that defendant would not be able to obtain post-conviction relief as to the aggravated murder charges on Counts 4 and 5. The court stated:

> "Defendant * * * did not appeal his convictions on the grounds that he was wrongly found guilty on Counts 4 or 5. He is therefore barred from seeking post-conviction relief on those grounds. [ORS 138.550]; *Palmer v. State of Oregon*, 318 Or 352, 867 P2d 1368 (1994). Further, because the trial court found as fact that defendant committed the murders in order to prevent the victim from revealing the perpetrators of the robbery and other crimes, and that finding is

supported by evidence in the record, the possibility of actually *achieving* meaningful post-conviction relief, even if it were possible to pursue it, would be so remote as to be essentially nonexistent."

*Link*, 214 Or App at 112 (emphasis in original).

This court allowed defendant's petition for review, limited to two of the questions presented by defendant: (1) whether a challenge to a conviction becomes moot if the conviction merges with other counts that have not been specifically challenged; and (2) what level of participation in a felony murder constitutes having "personally and intentionally committed the homicide" for purposes of aggravated felony murder under ORS 163.095(2)(d).[7] We must begin, then, by considering whether we can reach the issue regarding the interpretation of "personally and intentionally" in ORS 163.095(2)(d).

In that regard, the first issue that defendant presents challenges a holding that the Court of Appeals never made. Defendant contends that the Court of Appeals erred in holding that the matter was moot, and defendant's briefing attempts to refute that proposition. The Court of Appeals, however, did not hold that the matter was moot. Rather, the Court of Appeals concluded that any error was harmless. *Link*, 214 Or App at 111. We begin our analysis with that ruling. We then consider whether, in all events, the matter is moot.

## HARMLESS ERROR AND MOOTNESS

As the Court of Appeals correctly noted, the harmless error doctrine is prescribed by two authorities, one statutory and one constitutional.[8] The statutory authority for harmless error is ORS 138.230, which provides, in part:

---

[7] Because this court limited the questions on review, we express no opinion on the other issues addressed by the Court of Appeals. We also note that, on review, defendant makes no argument regarding the five counts of conspiracy to commit aggravated murder. Accordingly, we do not discuss those five counts.

[8] The term "harmless error" can be somewhat problematic. In *State v. Davis*, 336 Or 19, 77 P3d 1111 (2003), this court explained that the term "harmless error" was simply "a shorthand reference to a legal standard" and that it was not "an entirely accurate descriptor of the legal analysis that the constitution requires." *Id.* at 27.

"After hearing the appeal, the court shall give judgment, without regard to * * * technical errors, defects or exceptions which do not affect the substantial rights of the parties."

The Court of Appeals concluded that any error by the trial court in denying defendant's motion for judgment of acquittal did not affect defendant's substantial rights (as that term is used in ORS 138.230) because defendant presently has (or should have) one merged conviction for aggravated murder and his success on appeal would not change that result or the sentence imposed. In other words, even if the convictions on Counts 1 through 3 were set aside, defendant would still have one merged conviction for aggravated murder based on Counts 4 and 5, and he would still serve the same sentence.

As noted, the Court of Appeals based its conclusion in part on the view that defendant would not be able to obtain relief from his convictions on Counts 4 and 5. *Link*, 214 Or App at 112. The Court of Appeals correctly observed that defendant had not assigned error with respect to his convictions on Counts 4 and 5 and thus was barred from challenging those convictions in post-conviction proceedings on grounds that he reasonably could have asserted, but did not assert, on direct appeal. *Id.* at 112 (citing ORS 138.550 and *Palmer v. State of Oregon*, 318 Or 352, 867 P2d 1368 (1994)). Conversely, however, defendant was entitled to raise issues on post-conviction that he reasonably could not have raised on direct appeal. *See* ORS 138.550(2) (post-conviction relief available only if ground for relief "was not asserted and could not reasonably have been asserted in the direct appellate review proceeding"). *Palmer* identifies a number of circumstances in which that might occur. *See* 318 Or at 357-58 (recognizing that post-conviction court could consider arguments not made at trial where "counsel was incompetent or guilty of bad faith"; where "the right subsequently sought to be asserted was not generally recognized to be in existence at the time of trial; where counsel was excusably unaware of facts which would have disclosed a basis for the assertion of the right; and where duress or coercion prevented assertion of the right" (internal quotation marks and citation omitted)).

The Court of Appeals acknowledged that there was, therefore, a procedural possibility that defendant could obtain post-conviction relief from his convictions on Counts 4 and 5. However, based on the court's assessment that the likelihood of success was remote, the court deemed that relief to be a practical impossibility. *Link,* 214 Or App at 112. The court erred in relying on that conclusion as a basis for its determination that the alleged trial court error did not affect defendant's substantial rights. The court had no way to know the grounds that defendant might assert as the basis for a claim of post-conviction relief, and therefore it had no means of assessing the merits of defendant's potential claims. *See, e.g., Lichau v. Baldwin,* 333 Or 350, 39 P3d 851 (2002) (petitioner was entitled to post-conviction relief due to inadequate assistance of counsel who unreasonably had withdrawn petitioner's alibi defense).

The Court of Appeals also erred analytically by working backward from its conclusion—that defendant would stand convicted of aggravated murder and serve the same sentence, regardless of the strength of his position on appeal—instead of beginning with the significance of the relief that defendant seeks on appeal—acquittal of three of the charges against him. In Counts 1 through 3, the state charged defendant with committing the murder of the victim "personally and intentionally." The trial court's verdict as to each of those three charges was "guilty," and the trial court consequently convicted defendant of all three charges. On appeal, defendant seeks a ruling that the trial court erred in entering those verdicts and convictions.

■ When the state charges a defendant with illegal acts, the public is entitled to measure the truth of those charges not by the defendant's protests of innocence, but by the final judgment of the court. If the state does not produce facts necessary to sustain a verdict of guilty, then the defendant is entitled to a judgment of acquittal and to have the public record of his case reflect that judgment. Here, defendant was denied that opportunity because the Court of Appeals merged his convictions and then used the merger as a reason not to assess the sufficiency of the evidence to support their initial entry.

The statute setting out the requirements for judgments in criminal cases, ORS 137.071, recognizes a defendant's interest in having the criminal record correctly reflect the court's resolution of each charge that the state makes. That statute specifically requires that the judgment "must specify clearly the court's determination for each charge in the information, indictment or complaint." *Former* ORS 137.071(7) (1999).[9] If defendant in this case is correct that the trial court should have granted his motion for acquittal, then the judgment that the trial court entered did not reflect the correct determination for each charge in the indictment. The result in *Barrett* is consistent with ORS 137.071. In *Barrett*, the court required that the judgment of conviction specifically record each aggravating factor of which the defendant was found guilty, although the court concluded that only one conviction for aggravated murder could be entered. 331 Or at 36-37.

The state acknowledges that, in the past, a valid conviction on one count of aggravated murder has not deterred this court from reaching the issue of the validity of convictions on other counts of aggravated murder, or the accuracy of the judgment, even where the issue that the court reached had no impact on the sentence imposed. *See, e.g., State v. Zweigart*, 344 Or 619, 622, 188 P3d 242 (2008), *cert den*, ___ US ___ (2009) (affirming conviction on two counts of aggravated murder and sentence of death, but reversing one count of aggravated murder); *State v. Tiner*, 340 Or 551, 566-67, 135 P3d 305 (2006), *cert den*, 549 US 1169 (2007) (reaching unpreserved claims of error in form of judgment despite argument that death sentence would render issue moot); *State v. Hale*, 335 Or 612, 632, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004) (affirming convictions on seven counts of aggravated murder and associated sentences of death, but reversing convictions on six counts of aggravated murder and associated sentences of death); *State v. Langley*, 314 Or 247, 252, 269, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993) (affirming convictions on 15 counts of aggravated murder, but reversing

---

[9] A 2003 amendment renumbered that requirement; it is now found at ORS 137.071(2)(f). Or Laws 2003, ch 576, § 162.

conviction on one count of aggravated murder and vacating sentence of death for error in penalty phase). The state argues, however, that those prior decisions are not persuasive because none of them specifically addressed the reviewability issues that this case raises. In that regard, the state suggests that we focus our attention instead on *State v. Pratt*, 316 Or 561, 853 P2d 827, *cert den*, 510 US 969 (1993).

In *Pratt*, the defendant had been convicted on two counts of aggravated murder and sentenced to death. 316 Or at 564. During trial, the defendant had moved for a judgment of acquittal on one of the two aggravated murder counts, but the trial court had denied the motion. *Id.* at 575. On automatic and direct review, this court declined to decide whether the trial court had erred. The court explained its reasoning this way:

> "We need not decide that issue, * * * because, even if defendant were correct, the insufficiency of the evidence as to count two did not affect his conviction on count one or the resulting sentence of death. *See State v. Langley, supra,* 314 Or at 269 (trial court's error in denying defendant's motion for acquittal held to be reversible error; however, remaining aggravated murder convictions affirmed). Indeed, defendant does not suggest any manner in which the submission of count two to the jury might have affected adversely his conviction or sentence on [count one], and no such adverse effect is apparent to this court. Even if this court were to reverse defendant's conviction on count two, he still would stand convicted of one count of aggravated murder, and the sentence of death would remain. Accordingly, we decline to address the sufficiency issue further."

316 Or at 575.

The court's decision in *Pratt* not to exercise its discretion to consider the merits of the defendant's claim on appeal does not control the legal question with which we are presented here. In this case, the issue arises in a different context than that which existed in *Pratt*. Here, defendant has done what the defendant in *Pratt* did not do—he has identified the way in which his rights were affected by the trial court's denial of his motion for acquittal. In that regard, we have the benefit of the court's decision in *Barrett*. In *Barrett*, this court held that a conviction for aggravated murder must

specify each aggravating factor supporting the conviction. 331 Or at 36-37; *see also Tiner*, 340 Or at 566-67 (valid sentence of death did not render moot defendant's argument that judgment entered against him must accurately reflect merged convictions). To give effect to those cases and to the requirement of ORS 137.071(7) that a judgment be an accurate record of the court's determination on each charge, we must be able to review defendant's challenges to the guilty verdicts on Counts 1 through 3 of the indictment.

Although a ruling in defendant's favor on direct appeal would not, in itself, result in a reversal of his convictions on all five counts of aggravated murder, such a ruling would reverse the guilty verdicts entered on three of the five aggravated murder counts. If we were to adopt the position of the Court of Appeals, the guilty verdicts entered against defendant on Counts 1 through 3 would stand, not because the state proved those charges, but because the state proved that defendant was guilty of other, separate charges—those set forth in Counts 4 and 5. Merger of charges based on insufficient evidence would bar defendant from obtaining acquittal on those charges. That inverts the proper analytical sequence. The question whether a person is guilty as charged has an independent significance that cannot be foreclosed by later merger. Merger presumes the validity of the convictions being merged; acquittals do not merge with convictions.

We conclude that the ruling that defendant seeks would affect his substantial right, if the evidence were insufficient, to acquittal of the charges of aggravated felony murder. Therefore, the error, if any, was not harmless error under ORS 138.230.

■ We also conclude that the constitutional standard for harmless error under Article VII (Amended), section 3, of the Oregon Constitution has not been met here. That constitutional provision provides, in part:

"If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial * * *."

Under that section, this court must consider whether "the judgment of the court appealed from was such as should have been rendered in the case." In *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003), this court explained the appropriate test under that provision:

"* * * Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling."

The error that defendant alleges in this case is not harmless under the test articulated in *Davis*. If defendant is correct, then the trial court should not have entered a verdict of guilty on Counts 1 through 3. By definition, the court's error affected the verdict.

Our determination that the error that defendant claims affects his substantial rights also resolves the state's contention that this case is moot. If defendant is successful on his claim that the trial court erred in denying his motion for judgment of acquittal on Counts 1 through 3, then that ruling will have a "practical effect" on his rights in the same way that it affected his substantial rights for harmless error purposes: Defendant's judgment of conviction will be modified to reflect acquittals on the charge set forth in Counts 1 through 3. *See Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993) (stating that case is moot if decision will no longer have a practical effect on or concerning rights of parties). The matter, therefore, is not moot.

## SUFFICIENCY OF THE EVIDENCE

Defendant contends that the trial court erred in denying his motion for judgment of acquittal because the state did not adduce evidence from which a reasonable trier of fact could conclude that he had "personally and intentionally committed the homicide." ORS 163.095(2)(d). Defendant does not assert any issue as to the "intentionally" requirement; rather, the dispute surrounds whether defendant's conduct would permit a factfinder to conclude that he "personally * * * committed" the murder. Defendant contends

that one does not "personally" commit aggravated felony murder under ORS 163.095(2)(d) simply by aiding in the commission of a murder. To have "personally * * * committed" the murder, defendant argues, he "must have *physically* participated in the actual conduct that caused the victim's death." (Emphasis added.)

For its part, the state contends that "personally" reaches a much broader spectrum of conduct:

"Any conduct, either physical or verbal, that personally connects the defendant with the murder of the victim in a way that constitutes having an 'actual role in causing the death' is sufficient to prove aggravated felony murder."

The state contends that that definition is met here. Although the evidence would not support a finding that defendant shot the victim, the state asserts that the evidence would support a finding that defendant had a role in the shooting because he helped the others prepare for it and because he encouraged and even ordered them to kill the victim.

To determine the meaning of "personally" as it is used to define aggravated felony murder in ORS 163.095(2)(d), we must interpret that statute. In doing so, we first must understand how aggravated felony murder fits into the general framework of the murder statutes.

When a person causes or participates in the death of another, he or she may be convicted of various crimes ranging from criminal homicide to aggravated murder.

ORS 163.005 provides that a person commits criminal homicide

"if, without justification or excuse, the person intentionally, knowingly, recklessly or with criminal negligence *causes the death* of another human being."

(Emphasis added.)

ORS 163.115(1)(b) provides that criminal homicide constitutes felony murder

"[w]hen it is committed by a person, acting * * * with one or more persons, who commits or attempts to commit [certain felony] crimes and in the course of and in furtherance of the

crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant * * *, *causes the death* of a person other than one of the participants[.]"

(Emphasis added.) Thus, a defendant may be convicted of felony murder when, in the course of committing a felony, another participant in the felony causes a death. In that circumstance, the defendant may be convicted of felony murder even though the defendant did not participate in the murder, cause the death, or intend that the death occur. For example, a person who participates in a robbery may be guilty of felony murder if one of his or her companions kills the victim in the course of the robbery, even if the robber had no idea that the companion would strike the victim and did not intend that the companion kill the victim. *See State v. Williams*, 131 Or App 85, 87, 883 P2d 918 (1994), *adh'd to on recons*, 133 Or App 191, 891 P2d 3, *rev den*, 321 Or 512 (1995) (defendant convicted of felony murder when defendant and two companions robbed victim; one companion struck victim repeatedly with pipe and killed him).[10]

Criminal homicide constitutes intentional murder when the person who *causes the death* does so *intentionally*. ORS 163.115(1)(a).[11] That statute includes within its reach persons who commit a felony and, in the course of doing so, intentionally cause the death of a victim. Thus, if a participant in a felony also participates in and causes a murder, and does so intentionally, then the participant commits intentional murder, as well as felony murder. In the previous example, if the participant in the robbery also participated in and caused the murder by providing the pipe to his or her companion and intended that the companion kill the victim, the participant could be convicted of both intentional murder

---

[10] Oregon law provides an affirmative defense to felony murder if a participant in the felony (among other things) had no reasonable ground to believe that any other participant was armed with a deadly weapon and that any other participant intended to engage in conduct likely to result in death. *See* ORS 163.115(3) (listing elements of defense).

[11] ORS 163.115(1)(a) provides, in part:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"(a) When it is committed intentionally * * *."

and felony murder. *See State v. Gee*, 224 Or App 635, 637, 198 P3d 950 (2008) (defendant convicted of attempted intentional murder where, in drive-by shooting, defendant identified intended victim to companion and encouraged companion to shoot).

■     The aggravated felony murder statute imposes even more stringent criteria than does the intentional murder statute. *See State v. Ventris*, 337 Or 283, 292, 96 P3d 815 (2004) ("The murder statutes distinguish between 'ordinary' murder and murder that is accompanied by specified aggravating circumstances."). The statute defining aggravated murder, ORS 163.095, provides, in part:

> "As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:
>
> "* * * * *
>
> "(2)     * * *
>
> "(d)    Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b) [defining felony murder]."

Aggravated felony murder thus requires not only that the defendant be a participant in a felony (as required for felony murder) and that the defendant, with the intent to kill, participate in and cause the murder (as required for intentional murder), but also that the murder be accompanied by the aggravating circumstance that the defendant both *committed* the homicide and did so *personally*.

Both intentional murder and aggravated felony murder require that a defendant intend the death of the victim and participate in the homicide. The distinction between the crimes is the nature of the defendant's participation in the homicide. And that distinction carries with it a difference of real significance. Only a defendant convicted of aggravated felony murder is subject to the death penalty. *See* ORS 163.105(1)(a) (sentencing options for aggravated murder include death); *compare* ORS 163.115(5)(b) (sentence for

ordinary murder is life in prison with mandatory minimum of 25 years).

The meaning of the term "personally," one of the terms that distinguishes the crimes of aggravated felony murder and intentional murder, was the subject of this court's decision in *State v. Nefstad*, 309 Or 523, 789 P2d 1326 (1990). In that case, the state had accused the defendant and his companion of killing the victim by repeatedly stabbing him in the chest. The defendant had denied that he had inflicted the fatal wound and, in that regard, raised two issues on appeal: (1) whether, if the state did not prove that the defendant had inflicted the fatal wound, there was sufficient evidence to convict him of aggravated murder; and (2) whether the trial court had erred in its instructions to the jury. As to the first issue, the defendant suggested that, "as a matter of law, stabbing a victim without delivering the death blow[,] or pinioning the victim so that the death blow can be struck, does not constitute personally committing a homicide." *Id*. at 543. This court rejected that argument:

> "To state this contention is to refute it. Joining in the stabbing of a dying victim or restraining the victim so that he cannot avoid the fatal knife thrusts constitutes 'personally' committing the homicide. Thus, in the instant case, even if defendant choked and restrained the victim but did not also stab him, nonetheless defendant 'personally' committed this homicide and he is directly responsible for it."

*Id*.

As to the second issue, the defendant argued that the trial court had erred in giving the following instruction:

> "Personally in the context of aggravated murder means that[,] to be guilty of that crime[,] the Defendant must have had an actual role in causing the death and not merely a role in the felony during which the death occurred."

*Id*. at 541 (internal quotation marks omitted). The defendant did not object or except to that instruction on the basis that it failed to inform the jury that, to convict a defendant of aggravated felony murder, the state must prove that the defendant inflicted the fatal wound himself. The defendant's only exception was that "personally" was a word of common meaning

and that no jury instruction to define it was necessary. *Id.* at 541 n 10. In addressing that argument on review, this court explained that the term "personally" is not statutorily defined and that "[n]othing in either the legislative history of the aggravated murder statute or in its judicial interpretation suggests that 'personally' has any statutory meaning that departs from the common understanding of the word." *Id.* at 540. The court therefore agreed with the defendant that the term "personally" was understandable to the jurors without elaboration by the trial court. *Id.* at 539-41. The court then went on to state that, although the instruction was unnecessary, that did not mean that the trial court had erred in giving it. *Id.* at 541. The court concluded that the instruction was correct in the context of the limited nature of the defendant's exception. *See id.* at 541-42 (explaining why instruction was correct); *id.* at 541 n 10 (noting narrow exception by defendant).

*Nefstad* thus stands for two propositions: (1) to convict a defendant of aggravated felony murder, the state must prove that the defendant participated in the murder itself, not only in the underlying felony; and (2) evidence that a defendant physically acts to restrain the victim so that the victim "cannot avoid" the fatal blow is sufficient to establish that defendant "commit[s]" the homicide "personally." We have no quarrel with either conclusion, but neither answers the question that we face in this case: given that defendant did not perform the act of homicide himself, nor physically act to restrain the victim so that she could not avoid being shot, was his participation in the murder sufficient to establish that he committed the murder personally?

The state's first argument is that defendant's participation suffices because a defendant commits a murder personally any time the defendant has an "actual role in causing the death." For the reasons explained below, we reject that argument.

First, although the state bases its argument on the jury instruction in *Nefstad*, the court in that case did not decide whether any conduct other than physical conduct that restrains the victim to permit the fatal blow is sufficient to

establish the "personally * * * committed" element of aggravated felony murder. The instruction discussed in *Nefstad* used the words "actual role" to distinguish between an "actual role in causing the death and not merely a role in the felony during which the death occurred." *Id.* at 541. But beyond that threshold, "actual role" is not helpful in describing how significant a defendant's role in the murder must be to reach the level of personal action necessary to constitute committing aggravated felony murder.

Second, we know from the structure of the murder statutes set out earlier that, to be convicted of aggravated felony murder, rather than intentional murder, a person must do more than intend the murder and have some role in causing the death of the victim. The terms "personally" and "committed" are not used to describe the participation of the defendant in the crimes of homicide, felony murder, or intentional murder. Those terms must have a meaning beyond simply having an "actual role in causing the death," or else the aggravated felony murder statute would not require greater participation in the murder than those other, lesser offenses.

Third, the wording of the aggravated murder statute and the meaning of its terms compel rejection of the state's proposal. The common and ordinary meaning of "personally" is:

> "so as to be personal : in a personal manner; *often* : as oneself : on or for one's own part ‹~ I don't want to go›[.]"

*Webster's Third New International Dictionary* 1687 (unabridged ed 2002) (emphasis in original). The relevant definitions of "personal" are:

> "2 a : done in person without the intervention of another : direct from one person to another ‹a ~ inquiry›[.]"

*Id.* at 1686. In ORS 163.095(2), the term "personally" modifies the word "committed." The relevant definition of the term "commit" is:

> "DO, PERFORM ‹convicted of *committing* crimes against the state› ‹~suicide› ‹*committing* an even greater folly—O.S. Nock›[.]"

*Webster's* at 457 (emphases in original). Thus, applying the common and ordinary meaning of both terms used in ORS 163.095(2)(d), an individual "personally * * * commit[s]" murder when he or she does or performs the act in question, the act of homicide, "in a personal manner." The act of homicide is committed (done or performed) "in a personal manner" if a defendant performs it "in person without the intervention of another," "direct from [the defendant] to [the victim]," or, simply, himself or herself.

Fourth, the legislative history of the aggravated murder statute also indicates that the legislature intended to require that the defendant perform the act of homicide himself or herself. In discussing the legislative history of the aggravated felony murder statute, the court in *Nefstad* quoted the following testimony from Edward Sullivan, the chairman of the Governor's Task Force on Corrections:

> " 'The insertion of the word "personal[ly]" * * * was made to get at the person who deliberately committed murder in the course of a felony but not any of the other individuals who may have participated in the course of the felony. (Whether it be robbery or theft or whatever.) *What is meant * * * is that the person must have pulled the trigger or used the knife or what have you, himself * * *.*' "

309 Or at 540 n 8 (quoting Minutes, Senate Judiciary Committee (HB 2011), May 31, 1977, at 3) (emphasis and first alteration added; other alterations in original).

■      We conclude from the structure of the murder statutes, and from the wording and legislative history of the aggravated murder statute that, to prove aggravated felony murder, the state must prove that a defendant performed the physical act of homicide himself or herself.[12] That does not mean that the defendant must have acted alone or that the act of homicide need be a solitary physical act, or limited to the final fatal act. As in *Nefstad*, people acting together each may "personally * * * commit[ ]" the physical act of homicide.

---

[12] The instruction that the court gave in *Nefstad* did not inform the jury of that requirement, and trial courts should not use it in the future.

And, as in *Nefstad*, it may take a confluence of physical acts to effectuate the act of homicide.

To decide whether the evidence was sufficient to support defendant's conviction in this case, we

"examin[e] the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt."

*State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995) (citation omitted). Here, the act of homicide was one act—the act of shooting—committed by one person—Koch. Even if, as the state argues, the defendant was the leader of the group, he remained outside the house and was not physically present when Koch committed that act. Defendant did not perform the shooting himself.

That conclusion does not resolve this dispute, however. As an alternative argument, the state contends that the evidence that it adduced at trial would permit a reasonable trier of fact to find that defendant "personally * * * committed" the act of homicide, because the shooter had been "within his control" and he had used the shooter "as [an] instrument[ ] to accomplish his purpose."

We need not decide here whether a defendant personally commits an act if the defendant exercises such complete control over another that the other functions as the defendant's instrumentality. Even if that were true as a proposition of law—a decision that we need not and do not make—the facts quoted earlier in this opinion, which the state agrees accurately summarize the record, would not support such a finding. Although those facts establish that defendant encouraged and even directed Koch to shoot the victim, we do not think that they give rise to a reasonable inference that Koch was so completely within defendant's control that defendant was able to use Koch as an instrument to accomplish defendant's purpose.[13] The facts do not demonstrate, for instance, that defendant used force or threats of

---

[13] As discussed earlier, 346 Or at 193 n 4, in rendering its verdict the trial court also specifically found that defendant did not control the other four.

force to compel Koch to act as defendant's instrumentality or that Koch was acting under other duress or mental impairment.[14] We conclude, therefore, that a reasonable trier of fact could not have found that defendant committed the act of homicide personally, either individually or by controlling Koch as his instrumentality.

## CONCLUSION

In summary, we hold that the trial court erred in denying defendant's motion for judgment of acquittal as to Counts 1 through 3 and in finding him guilty of those charges. That error was not harmless, and the issues that defendant raised were not moot.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

---

[14] We mention those facts not to indicate that they necessarily would demonstrate a requisite degree of control, but only to indicate that the record is devoid of such facts.